**SUGARLAND INDUSTRIES, INC.,**
Appellant,

v.

**A. J. FALCO et al., Appellees.**

No. 3982.

Court of Civil Appeals of Texas.

Waco.

Sept. 20, 1962.

Rehearing Denied Oct. 11, 1962.

See also 348 S.W.2d 102.

Baker, Botts, Andrews & Shepherd, Alvin M. Owsley, Jr., Houston, and John C. Held, Waco, Charles E. Reagan, Marlin, for appellant.

Dunnam, Dunnam & Dunnam, Waco, for appellees.

TIREY, Justice.

Plaintiffs grounded their action upon a knowingly fraudulent misrepresentation of the germination rate of certain cotton seed which was sold by defendant to them. The jury, in its verdict, found substantially that

defendant represented to the plaintiffs that the seed had a germination rate of 80%, and that the plaintiffs relied on such representation; that such representation induced the plaintiffs to purchase the seed, and that defendant intended for such representation to induce them to purchase the seed; that Rufus Phillips was the Manager of a department of the business of defendant, and that Phillips intended that such representation would induce the plaintiffs to purchase the seed; that Phillips knew that the seed did not have a germination rate of 80% at the time of the delivery of the seed to plaintiffs; that Phillips willfully permitted the seed to be represented to the plaintiffs as having a germination rate of 80%; that the plaintiffs lost profits in the amounts of $52,-241.08 during the year of 1959 as a proximate result of the cotton seed's not having had a germination rate of 80%; and that defendant should have exacted from it as exemplary damages $25,000.00.

At the close of the evidence the Court overruled defendant's motion for instructed verdict, and after the verdict overruled defendant's motion for judgment notwithstanding the verdict and motion to disregard answers to certain issues and to enter judgment for defendant, and entered judgment for plaintiffs on the verdict, and thereafter overruled defendant's motion for new trial, to which it excepted and perfected its appeal to this court.

Points 1 and 2 are to the effect that there is no evidence, or insufficient evidence, to support the jury's answer to Issue No. 9, which inquired whether Phillips knew the cotton seed did not have a germination rate of 80% at the time of the delivery of the seed to plaintiff's farm.

Points 9 and 10 are to the effect that the court erred in submitting Issue 12, inquiring about actual damages, because there is no evidence, or insufficient evidence, to support a cause of action on which to base any actual damages.

A statement is necessary. The sale of the seed to the plaintiffs was made by a Mr. Hop Marshall who was an independent cotton merchant, but was also the agent for the appellant in the sale of this seed, and his authority and agency is not here questioned. Marshall made the sale to plaintiffs in February 1959. He testified specifically:

"Q. Did you make any statement to them regarding the germination rate of that seed?

"A. I told them the bags would be tagged 80 plus. 80 or better, in fact.

"Q. Rufus Phillips told you they would be 80 or better?

"A. Yes.

"Q. Was it so tagged on the sacks of seed?

"A. I did not examine every sack, but those sacks I did examine were so tagged."

He further testified to the effect that the plaintiffs paid either $8.50 or $9.00 per sack and that the seed were delivered in accordance with the order to the Falco seed house in Falls County at Highbank, and that he hired Vince Corpora, who used his truck, to deliver the seed. There were no further negotiations between Marshall and the plaintiffs with reference to the sale and delivery of the seed. Rufus Phillips had no personal contact with plaintiffs with reference to these seed.

Jack Falco, one of the plaintiffs, testified to the effect that Marshall talked to Louis Corpora and him one time, and that he told them the seed would be 80% germination; that he believed him; that he was not present when the seed were delivered but the seed were placed in his seed house; that they began planting in the latter part of April and planting continued up to May 7th; that he did not see the tags on the seed until he looked at the seed in the seed house, and that was sometime after the seed were delivered, but he did not give the date; that he saw the tags on the seed before they planted. He testified specifically: "I help-

ed tear the sacks open when we started planting", and that he read the tags before he planted the seed.

Plaintiff Corpora testified to the effect that he was present when the cotton seed was delivered to the Falco seed house at Highbank:

"Q. Did you observe the tags on that seed?

"A. Yes Sir.

"Q. Did you rely on them.

"A. I sure did."

One of the tags on the seed was marked "Vendor's statement of analysis" and on this card it said "Germination 80%." Another tag had printed thereon:

"WE GUARANTEE the germination, weight and purity of this seed as tagged.

"The buyer may examine and run germination tests within 15 days after purchase. Due to soil and climatic conditions and cultivation practices, over which we have no control, we give NO WARRANTY, express or implied, as to stand obtained or quality of crop produced.

SUGARLAND
INDUSTRIES, INC.

Sugar Land, Texas."

Plaintiffs base their cause of action for exemplary damages on their allegation that Phillips, an official of appellant in charge of operation at the gin plant, knew that the cotton seed sold did not have a germination rate of 80% at the time it was delivered to the plaintiffs. We quote the pertinent direct testimony in Q and A form. The witness Reagan, for the plaintiffs, testified in part as follows:

"Q. Did you have occasion to be at Sugarland Industries' cotton seed processing facilities prior to 1959?

"A. I sure did. I used to work for the company. In fact, at the time I worked for the company on strictly a comission and freight basis.

"Q. At that time did you observe anything unusual?

"A. One day I walked in the gin and was talking to a gin repair man—
* * *

"Q. It was at their gin facilties?

"A. Yes sir.

"Q. Will you describe what you saw at that time * * * What year was it in?

"A. 1957.

"Q. Mr. Reagan, what did you observe there that day at their gotton ginning facilities?

"A. When I walked in the gin, I met a gin repairman that was there, and I looked over, and they are set up with a two gin system. One to gin their registered seed which is to be certified, and the other is for cotton ginned of all different varieties from the farmers. And they were ginning cotton, ginning and blowing the seed into the bulk house seed that was going to be certified blue tag. I went to the ginner, Mr. Rufus Phillips—

"Q. Mr. Rufus Phillips here?

"A. Yes, and complained about it. I said, 'Mr. Phillips, I respect my name and Sugarland Industries' also, and also the farmers I am selling seed.' And I said, 'This is going to lower the germination of this seed.' That went on for two or three weeks. When it was time for me to get seed, I didn't get any seed only what they sold themselves and asked me to deliver. I work strictly on a commission, plus freight. And they put me out of business.

"Q. When you said that Mr. Phillips, did you ask them about being hungry?

"A. I kind of joshed them a little bit, 'What is the idea. Are you peo-

ple hungry? What is the idea of doing this?'

"Q. What was Mr. Phillips' reply to you?

"A. He asked me was I trying to interfere with his bread and butter. * * * That is all that was said.

"Q. That was Rufus Phillips, this man sitting right here, that you are talking about?

"A. That is right."

Rufus Phillips testified in part:

"Q. During the five year period up to 1959 did you handle it in the same way you were handling it in 1959?

"A. Yes, sir.

"Q. You mean completely through the process up through the selling was handled in the same way?

"A. I would say practically the same way.

"Q. Was it ginned and sacked in the same manner?

"A. Yes, sir.

* * * * * *

"Q. Were you in the courtroom when Mr. Reagan testified this morning?

"A. Yes.

"Q. Did you hear him say what he said about you?

"A. Yes, sir.

"Q. Was it true?

"A. No, sir, there wasn't a word of truth in it.

"Q. Would you please tell the jury now what kind of gin system you had down there at that time? And you remember that part where he said—I have forgot—about you running some seed from one part to another. Tell us how you did operate down there at that time.

"A. I think I explained that to the jury yesterday. We have two separate gins. One is a certified gin, and one is a cotton gin. There is no physical way to take the seed from the cotton gin into the certified house. The seed from the cotton gin goes through a pipe straight to the oil mill. The seed coming from the certified gin goes through a pipe to a cyclone separator, a blower separator, and it is conveyed to individual bins in the certified seed house. There is no way you can get seed into the certified bin, because there is no open pipe from the cotton gin. It must go directly to the oil mill.

"Q. Did Mr. Reagan say anything like he said he said to you this morning in that gin house in 1957?

"A. No, sir.

"Q. When I say 'anything like', I mean anything at all of that nature.

"A. I don't ever remember the man being in the gin plant, because we don't operate the gin plant and the seed delinting plant at the same time.

"Q. Did you ever make any remarks to him like he said you did, like 'this was your bread and butter,' and so forth?

"A. No, sir.

"Q. Would you knowingly sell a bad seed?

"A. No, sir."

▮▮▮ Assuming that the testimony of the witness Reagan was true, which we must do under the verdict of the jury, we are of the view that it does not tender an issue that defendant knew that the seed did not have the germination rate of 80% at the time of the sale and delivery, or at any other time pertinent to this issue. Further, assuming that defendant did mix

oil mill seed or seed received from the ginning of a variety of cotton with certified seed in 1957, and that said practice continued up until 1959, we are of the further view that there is no evidence that such mixing did lower the germination rate of the certified seed. The reasons for the separation of oil mill seed from certified seed which may or may not go to the oil mill are technical and complex and do not necessarily have anything to do with the germination rate. If we be mistaken in the view that there is no evidence, then and in such event we are of the further view that the evidence is wholly insufficient to support the jury's finding that Phillips knew that the cotton seed did not have the germination rate of 80% at the time it was sold and delivered. In Dallas Railway and Terminal Company v. Gossett, 156 Tex. 252, 294 S.W.2d 377, point 4, we find this statement of the rule by our Supreme Court: "It is well settled that the naked and unsupported opinion or conclusion of a witness does not constitute evidence of probative force and will not support a jury finding even when admitted without objection". Citing many cases. See also Henry v. Phillips, 105 Tex. 459, 151 S.W. 533, pt. 4, p. 538; Aetna Ins. Co. v. Klein, 160 Tex. 61, 325 S.W.2d 376, pt. 9, p. 381. But appellees say that there are circumstances in the record to support Reagan's testimony to the effect that defendant knew that the seed did not have a germination rate of 80% at the time they were sold and delivered and cites the testimony of the witness Corpora. We quote the pertinent part of this testimony.

"Q. If this cotton seed at the time it was tested, the seed that was delivered to you, if that cotton seed had tested out eighty per cent in November, 1958, would it still have been eighty per cent germination at the time it was checked by the Department of Agriculture?

"A. It always has. I have never seen it change that much.

"Q. In your opinion, could it have changed, and been the same cotton seed?

"A. No, sir.

"Q. In your opinion, was the seed they delivered to your place in February, 1959, sacked up under their labels, was that the same seed from which they took samples and got their blue tags to sell from?

"A. It couldn't possibly have been."

We think the foregoing testimony is without probative force under the Rule of our Supreme Court above stated. It follows that we are of the view that the jury's award for exemplary damages cannot be sustained.

■ Points 4 and 5 are substantially to the effect that there is no evidence to support the jury's finding to Issue No. 12 relating to actual damages because as a part of the damage issue as submitted, there was no instruction to the jury to deduct expenses of operation in the raising and selling of cotton and there was no evidence of transportation costs from the place of raising cotton to the proper marketing area. We overrule these contentions.

■ We have carefully examined the evidence tendered in this cause and we are of the view that it is ample to sustain the finding of actual damages made by the jury of $52,241.08. But, appellant says that plaintiffs can, in no event, recover actual damages against it by reason of the contents of the tag placed upon each sack of cotton seed sold and delivered by it to plaintiffs, because one or more of the plaintiffs testified that they saw the tag on the seed and because the jury, in response to Issue 24, found that one or more of the plaintiffs knew of the wording on the guaranty tag. Defendant relies on the following authorities: Dutch Mill Gardens v. J. J. Grullemans & Sons, 238 S.W.2d 232, (Galv.Civ.App., 1951, error refused); Grindstaff v. Mather, 186 S.W.2d 364

(Amarillo Civ.App., 1945, error ref'd., w. m.); Hall v. Mosteller, 245 S.W.2d 338 (Austin Civ.App., 1952, error ref'd., n. r. e.); Magnolia Provision Co. v. Coleman, 3 S.W.2d 412 (Tex.Com.App., 1928); Martin v. Southern Engine and Pump Co., 130 S.W.2d 1065 (Galv.Civ.App., 1939, no writ history); Pyle v. Eastern Seed Co., 145 Tex. 385, 198 S.W.2d 562 (1946); Southwestern Industrial Products Co. v. Chippewa Molding, Inc., 263 F.2d 402 (5th Cir. 1959). We have carefully read each of the foregoing authorities and do not believe they are controlling or applicable in the factual situation here existing. It is also the appellant's contention that the second paragraph on the tag is a limitation of all liability for consequential damages. We are not in accord with appellant's view.

In Pyle v. Eastern Seed Co., supra, relied on by appellant, the buyer agreed to the contract that provided "that the seller gave no warranty, express or implied, as to description, purity or productivity, and would not be in any manner responsible for the crop." That situation does not exist here. The record is without dispute that this sale was made by Marshall, acting in his capacity as agent, and the consideration passed from plaintiffs to appellant on the oral contract that Marshall made with the plaintiffs, which was to the effect that the seed had a germination rate of 80%. There was no other negotiation or oral agreement between the parties to this sale, and the seed were sold and delivered on that basis. The contract was made when the parties made their oral agreement. There is no evidence that Marshall at any time advised the plaintiffs that the tags on the seed would contain the no warranty clause printed thereon. Under the foregoing undisputed factual situation, we are of the view that the no warranty clause printed on the tag is no part of the contract between the parties for the sale and delivery of the cotton seed. We are of the view that the foregoing undisputed factual situation brings the cause within the rule announced in Davis v. Ferguson Seed Farms, Tex.Civ.App.,

255 S.W. 655, n. w. h., wherein the Beaumont court made the following statement of the rule:

"The general rule is that when the purchaser discloses to the seller that the article is intended for a special use, and the seller sells it to the purchaser for that purpose and for a sound price, [the exact situation here] there is an implied warranty that the article is suitable for the purposes for which it is sold, and free from hidden defects that would impair its use for such purpose, and especially is this true where the seller is the producer or manufacturer of the article sold. * * that if a warranty was actually made during the negotiations for the purchase of the seed, and not withdrawn or modified, it should be given effect, irrespective of the printed disclaimers."

Citing Moorhead v. Minneapolis Seed Co., 139 Minn. 11, 165 N.W. 484; L.R.A.1918C, 391 Ann.Cas.1918E, 481; Edgar v. Joseph Breck & Sons Corp., 172 Mass. 581, 52 N.E. 1083; Landreth v. Wyckoff, 67 App. Div. 145, 73 N.Y.S. 388; Bell v. Mills, 78 App.Div. 42, 80 N.Y.S. 34; Smith Brothers Grain Co. v. Windsor & Stanley (Tex.Civ. App.) 242 S.W. 350. See also: Hoffman v. Dixon, 105 Wis. 315, 81 N.W. 491.

In Edgar v. Joseph Breck & Sons Corp. supra, Mr. Justice Holmes made this statement in a situation that is similar to the one before us:

"The contract was made when the parties made their oral agreement. * * * It was satisfied by delivery of the bulbs. The general printed warning on the billhead that the defendant did not warrant seeds could have no effect unless it led to the inference that the old contract had been rescinded, and a new one substituted, by mutual agreement. Even if the bill had been receipted, it would not have excluded proof of warranty, and, whether it was evidence of a rescis-

sion or not, it did not establish one as a matter of law."

It follows that we are of the view that the judgment awarding plaintiffs actual damages in the sum of $52,241.08 for loss of profits is sustained, and the apportionment of ⅕th to J. T. Falco, and ⅘th to A. J. Falco and Louis Corpora, jointly, is in all things affirmed, with interest thereon from date of judgment, 9th day of October, 1961, at the rate of 6% per annum. The judgment awarding the sum of $25,000.00 exemplary damages is reversed and rendered. It follows that the points of appellant relating to exemplary damages are in each instance sustained. Each of the other points has been considered and each is overruled. The judgment is affirmed in part and in part reversed and rendered. All costs of appeal are taxed against appellees.