**TWO RIVERS COMPANY,**
**Plaintiff-Appellee,**

v.

**CURTISS BREEDING SERVICE,**
**Division of Searle Agriculture**
**Inc., Defendant-Appellant,**

**Hi-Pro Feeds, Inc., Defendant.**

No. 78–1014.

United States Court of Appeals,
Fifth Circuit.

Aug. 25, 1980.

Rehearing and Rehearing En Banc
Denied Oct. 6, 1980.

Tate, Circuit Judge, filed a dissenting opinion.

David S. Kidder, Timothy R. McCormick, Dallas, Tex., for defendant-appellant.

Hubbard, Patton, Peek, Haltom & Roberts, George L. McWilliams, Texarkana, Tex., for plaintiff-appellee.

Before THORNBERRY, GODBOLD, and TATE, Circuit Judges.

THORNBERRY, Circuit Judge:

This action was brought by Two Rivers Company (Two Rivers), alleging that it purchased from Hi-Pro Feeds, Inc. (Hi-Pro) semen used for artificial insemination of its cattle, and that the semen caused syndactylism in the offspring of its cattle. The semen was marketed by Curtiss Breeding Service, Division of Searle Agriculture, Inc. (Curtiss). Two Rivers' claim for damages against Curtiss and Hi-Pro is based on the doctrines of strict liability and implied warranty.

This appeal arises from a jury verdict in favor of Two Rivers. The jury apparently found that Curtiss was strictly liable for the sale of defective semen and that Curtiss breached its implied warranty of merchantability. The jury also found that Two Rivers was entitled to damages in the sum of $52,900.00. This amount represents the damage to the reputation of Two Rivers' herd of cattle as computed by the loss of the prospective market value of the cattle. The court entered judgment for plaintiff in the amount found by the jury and denied Curtiss's motion for judgment notwithstanding the verdict. We hold that, under Texas law, the district court erred in that Two Rivers is not entitled to a recovery of damages based on either strict liability or implied warranty.

Curtiss markets semen around the world that is used to artificially inseminate cattle. Because federal regulations prohibit direct importation of certain bulls into the United States, Curtiss maintains its bulls in other countries and imports semen into the United States. The process of artificial insemination allows one sire to artificially inseminate thousands of cattle in its lifetime while a bull in natural service can sire no more than 125–150 offspring in the same span of time. These techniques allow a breeder access to many different bulls without incurring the cost of maintaining a large number of bulls.

Curtiss markets the semen of many different breeds of cattle, including the Chianina breed. In 1972, Curtiss entered into an agreement with a Canadian firm to market in the United States the semen from a Chianina bull known as Farro AC–35. Before entering into this agreement, Curtiss conducted an examination of Farro's pedigree and of the Chianina breed.

In 1973 and 1974, Two Rivers purchased over one hundred registered one-half blood Chianina heifers with the intention of developing a purebred line of Chianina cattle by artificially breeding successive generations. To accomplish this goal, Two Rivers contracted with Mr. Tony Hall in 1974 to obtain quality semen and artificially insemi-nate the herd of one-half blood Chianina heifers.

Hall is a Texarkana dairyman who also artificially inseminates cattle as a part-time job. Hall successfully completed a two-week course in 1957, where he learned how to artificially inseminate cattle, and he has since continued in this business as a technician.

Hall, as an agent of Two Rivers, was given the responsibility of selecting the bull and the semen supplier. He purchased on his own account the Farro semen, which was marketed by Curtiss through Hi-Pro Feeds, Inc., that was used to breed the Two Rivers cattle. When purchasing the semen, he examined a pamphlet entitled the "1974 Curtiss Beef Breeding Guide" which contained a conspicuous disclaimer of any express or implied warranties. After consummating the purchase, Hall transported the semen to Two Rivers and inseminated the cattle. Hall charged Two Rivers a certain amount for each heifer he inseminated.

On July 24, 1974, Curtiss determined that Farro had sired offspring which might have exhibited the genetic abnormality known as syndactylism. Curtiss immediately notified its distributors and informed them that they were recalling the semen. At that time, Two Rivers had already inseminated 64 of the heifers with Farro semen. While some ranchers continued to use Farro semen, Two Rivers decided to switch to another bull. Of the 64 heifers that were artificially inseminated with Farro semen, 22 calves were born alive. Four of the Farro calves were stillborn and exhibited the genetic abnormality known as syndactylism.

Syndactylism is a genetic abnormality that can only appear when both the sire and the dam are carriers of the recessive gene. Therefore, Farro, as well as several of the heifers purchased by Two Rivers, were carriers. Syndactylism is exhibited by the fusion or nondivision of the functional digits of one or more feet of a cow. It is a hereditary genetic trait traced to the recessive gene. It is virtually impossible to detect the existence of a recessive genetic

trait such as syndactylism until it is manifested by the union of two carriers of this recessive gene.

Two Rivers commenced this lawsuit on February 26, 1976, seeking two elements of damages in the amount of $52,900.00. This included the loss of the value of the stillborn calves and loss of the prospective market value of the entire herd.[1] The trial commenced on October 20, 1977, in the United States District Court for the Eastern District of Texas. On October 24, 1977, a verdict was entered in favor of Two Rivers assessing damages of $52,900.00 against Curtiss. Curtiss now appeals claiming that (1) the law of strict liability cannot be applied to this fact situation which involves a claim for economic loss and (2) any implied warranties were properly disclaimed. We agree with Curtiss and accordingly reverse the decision of the district court.

## TYPES OF LOSS

The critical question presented in this case is whether Two Rivers is entitled to an award of damages pursuant to section 402A of the Restatement (Second) of Torts, the implied warranties of the Uniform Commercial Code, or under both theories. To analyze this issue, it is necessary to distinguish the four types of property loss which are recognized in Texas. A different legal analysis attaches to each type of loss.

The first type of loss involves personal injury to the user (or consumer) or physical injury to the property of the user (or con-

sumer). It is specifically covered by the language of section 402A of the Restatement (Second) of Torts which states that:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for *physical harm thereby caused to the ultimate user or consumer, or to his property,* if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

Restatement (Second) of Torts § 402A (1965) (emphasis added)., Texas courts adopted the language of section 402A in 1967 and have applied strict liability to the case of personal injuries resulting from unreasonably dangerous products, *Turner v. General Motors Corp.*, 584 S.W.2d 844 (Tex. 1979); *Bristol-Myers Company v. Gonzales,* 561 S.W.2d 801 (Tex.1978); *General Motors Corp. v. Hopkins,* 548 S.W.2d 344 (Tex. 1977); *Rourke v. Garza,* 530 S.W.2d 794 (Tex.1975); *Crocker v. Winthrop Laboratories, Inc.,* 514 S.W.2d 429 (Tex.1974); *Darryl v. Ford Motor Company,* 440 S.W.2d 630

---

1. John Davenport, owner of Two Rivers, testified that the difference in value between a heifer used for breeding ($750) and one sold for slaughter ($125) is approximately $625. In the case of a bull, the difference is approximately $375 ($500 for breeding less $125 for slaughter). Two Rivers claims that it is entitled to damages for calves born in the first crop as well as in the second crop, even though no calves were born with syndactylism in the second crop, because they claim that the stigma of syndactylism attaches to the entire herd. The total amount sought as damages of $52,900 is computed as follows:

| | |
|---|---:|
| FIRST CROP | |
| Healthy Calves | |
| Heifers (38 × $625) | $23,750 |
| Bulls (30 × $375) | 11,250 |
| Syndactyl Calves | |
| Heifers (3 × $750) | 2,250 |
| Bulls (1 × $500) | 500 |
| SECOND CROP | |
| Healthy Calves | |
| Heifers (16 × $625) | 10,000 |
| Bulls (14 × $375) | 5,250 |
| | 53,000 |
| MATHEMATICAL ERROR | (100) |
| TOTAL DAMAGES SOUGHT | $52,900 |

It is significant to note that only 22 of the 98 calves born alive were sired by Farro, but Two Rivers seeks damages for loss of value to the entire herd, arguing that the stigma of syndactylism attaches to the entire herd.

(Tex.1969); *McKisson v. Sales Affiliates, Inc.*, 416 S.W.2d 787 (Tex.1967); *Shamrock Fuel & Oil Sales Co. v. Tunks*, 416 S.W.2d 779 (Tex.1967), as well as to physical injuries to a consumer's property other than the product caused by a defective product. *Signal Oil and Gas Co. v. Universal Oil Products*, 572 S.W.2d 320 (Tex.1978); *O. M. Franklin Serum Co. v. C. A. Hoover & Son*, 418 S.W.2d 482 (Tex.1967); *Tide Products, Inc. v. Browning*, 493 S.W.2d 654 (Tex.Civ. App.—Amarillo 1973, no writ); *FMC Corp. v. Burns*, 444 S.W.2d 315 (Tex.Civ.App.— San Antonio 1969, no writ).

The second type of loss, on the complete opposite end of the spectrum, can be classified as economic loss resulting from a product with defective workmanship or materials. This category of loss was examined in *Nobility Homes of Texas v. Shivers*, 557 S.W.2d 77 (Tex.1977), where an individual who purchased a mobile home sought to recover damages for economic loss suffered as the result of defects in the product. The mobile home was negligently constructed and was not fit for the purposes for which it was sold. The consumer was awarded $8,750 as the difference between the purchase price and the market value of the mobile home for his economic loss.[2]

▮ The court held in *Nobility Homes* that an individual may not recover for economic loss under section 402A. The court stated that an individual must instead seek damages under the implied warranties of the Uniform Commercial Code and the theory of common law negligence. Strict liability was not extended to instances of economic loss because the distinction that exists between physical damage and commercial loss had to be recognized. The Uniform Commercial Code governs the case of a mere loss of value resulting from the fail-

ure of the product to perform according to the contractual bargain and the expectations of the consumer.

A third type of loss consists of "economic loss to the purchased product itself." *Mid Continent Aircraft Corp. v. Curry County Spraying Service*, 572 S.W.2d 308 (Tex. 1978). In *Mid Continent Aircraft*, plaintiff sought damages for physical injury to an airplane (damage to fuselage and wings) and for loss of its use value when it made a forced landing because an individual negligently failed to install a crankshaft gear bolt lock plate. Noting that the explicit language of section 402A applied only to physical harm to a person or his *other* property, the court stated that in a commercial sale, strict liability should not be extended to cover a loss resulting from damage to the product itself. The court stated that "when no physical injury has occurred to persons or other property, injury to the defective product itself is an economic loss governed by the Uniform Commercial Code." 572 S.W.2d at 313. This is because the damage to the product is merely a loss to the purchaser of the benefit of the bargain with the seller.

▮ The fourth type of loss is a hybrid involving physical harm to a plaintiff's *other* property as well as to the product itself. This fact pattern was presented in *Signal Oil* where a defective isomax reactor charge heater exploded. The explosion and ensuing fire at Signal Oil's Houston refinery destroyed not only the heater, but also a significant portion of the refinery (other property). It is clear that the damage to the refinery presents a strict liability cause of action under section 402A since a buyer is entitled to recover for damage to his other property. But the court went even further and held that:

2. The Texas Supreme Court in *Nobility Homes* adopted in a footnote the following definition of economic loss:

Direct economic loss may be said to encompass damage based on insufficient product value; thus, direct economic loss may be "out of pocket"—the difference in value between what is given and received—or "loss of bargain"—the difference between the value of what is received and its value as repre-

sented. Direct economic loss also may be measured by costs of replacement and repair. Consequential economic loss includes all indirect loss, such as loss of profits resulting from inability to make use of the defective product.

557 S.W.2d at 78, n. 1 *quoting* Note, *Economic Loss in Products Liability Jurisprudence*, 66 Colum.L.Rev. 917 (1966).

[W]here such collateral property damage exists in addition to damage to the product itself, recovery for such damages are recoverable under Section 402A of the Restatement (Second) of Torts as damage to property *or* under the Texas Business and Commerce Code, Section 2.715, as consequential damages for a breach of an implied warranty. To the extent that the product itself has become part of the accident risk or the tort by causing collateral property damage, it is properly considered as part of the property damages, rather than as economic loss.

572 S.W.2d at 325 (emphasis added). Therefore, if both the product and other property are damaged, a plaintiff has a cause of action under strict liability and the U.C.C.

## STRICT LIABILITY

Two Rivers asserts a cause of action based on the doctrine of strict liability against Curtiss, alleging that Curtiss sold a genetically defective product that was unreasonably dangerous. Two Rivers sought damages for the loss of the market value of the entire herd and for the value of the four calves born with syndactylism. In assessing Two Rivers' claim, the herd of calves must be divided into two groups: a group composed of those calves that received a gene for syndactyl from Farro semen (including the four syndactyl calves) and a second group composed of those calves that were not artificially inseminated with Farro semen.

Only 22 of the 98 calves born alive were the product of Farro's semen. Two Rivers claims that it is entitled to damages equal to the reduction in the market value of the 76 non-Farro calves (the second group) because of the stigma caused by having as many as 22 carriers in the herd.

█ After an examination of the controlling Texas case law, it is clear that Two Rivers has not stated a cause of action under strict liability with respect to the second group of calves. If anything, any damage incurred upon discovering and making publicly known a latent physical defect in the herd of one-half blood Chianina heifers purchased by Two Rivers constitutes economic loss governed by the rules of commercial law. A plaintiff in Texas is precluded from recovering for economic loss under strict liability.

First, it is obvious that this injury does not come within either the first or fourth category of loss, discussed *supra*, each of which provides for recovery under the doctrine of strict liability. There was obviously no physical injury to any of the 76 calves merely because the other 22 calves were artificially inseminated with Farro semen. Second, a decrease in market value can best be described as an intangible commercial loss. Keeton, *Private Law Torts*, 25 S.W. L.J. 1 (1971). The syndactyly gene that some of these calves undoubtedly carry was already present in Two Rivers' original herd. The crux of Two Rivers' complaint about the non-Farro calves is that everyone now knows about this potentially deleterious gene and that since it is impossible to distinguish the carrier from the noncarrier calves, the value of all the calves is reduced. This loss in market value due solely to the stigma of an accidentally discovered defective gene is, if anything, a commercial loss that is not cognizable in strict liability.

With respect to the first group of calves (artificially inseminated with Farro semen), the question is much more difficult. These calves were either born with a syndactyly gene or were possible carriers of syndactylism. The damage suffered by Two Rivers does not fit neatly into any one of the four categories discussed above.

On the one hand, it could be argued that this case presents a situation merely involving injury to the product itself. Therefore, it would only involve economic loss governed by *Mid Continent* and the U.C.C. At least some of the product, Farro semen, carried the recessive gene. This semen was used to fertilize ova produced by Two Rivers' herd, at least some of which also carried the defective gene. As a result, four of the calves born were syndactyl, and some or perhaps all of the remaining calves were carriers. Arguably, a calf is a contin-

uation of the product (bull semen) so any damage was to the product itself and not to any *other* property. Therefore, this case would be governed by *Mid Continent* and the U.C.C.

On the other hand, it could just as easily be argued that the product (bull semen) is a constituent part of a new product (the calf) which is *other* property. Because there is damage to *other* property, *Signal Oil* would provide for recovery under the doctrine of strict liability.

But *Mid Continent* and *Signal Oil* do not fit the situation presented in this case. Both of these cases deal with mechanical items involving incorporation of parts into a whole. They do not address the question presented in this case where the product (bull semen) reacts with another product to create something new through the biological process of mammalian reproduction that is a continuation of both products. In this case, once fertilization has occurred, the products are inextricably interwoven. Unlike a defective crankshaft gear bolt lock plate or isomax reactor charge heater that may be replaced to cure the defect in the whole, fertilization irrevocably prohibits replacement of a component part to result in a satisfactory whole. *Mid Continent* and *Signal Oil* are concerned with mechanical items and the concept of a part or a whole in a mechanical sense as opposed to a biological sense. While they are helpful in determining the reasoning of the Texas Supreme Court, they are not dispositive of this case.

Because there are no Texas Supreme Court cases on point dealing with the situation where one product is biologically combined with another to form, by a natural process, a continuation of those products, we must decide whether the Texas Supreme Court would view this case as one that should be governed by the doctrine of strict liability or the rules of commercial law. The theoretical bases and policy rationale of contract law and strict liability have been separated and firmly established. *Mid Continent, supra*, 572 S.W.2d at 311. The Texas Supreme Court noted the distinction in

*Nobility Homes* when it quoted the following language of Chief Justice Traynor:

> The law of sales has been carefully articulated to govern the economic relations between suppliers and consumers of goods. The history of the doctrine of strict liability in tort indicates that it was designed, not to undermine the warranty provisions of the sales act or of the Uniform Commercial Code but, rather, to govern the distinct problem of physical injuries.

> \* \* \* \* \* \*

> The distinction that the law has drawn between tort recovery for physical injuries and warranty recovery for economic loss is not arbitrary and does not rest on the "luck" of one plaintiff in having an accident causing physical injury. The distinction rests, rather, on an understanding of the nature of the responsibility a manufacturer must undertake in distributing his products. He can appropriately be held liable for physical injuries caused by defects by requiring his goods to match a standard of safety defined in terms of conditions that create unreasonable risks of harm. He cannot be held for the level of performance of his products in the consumer's business unless he agrees that the product was designed to meet the consumer's demands.

557 S.W.2d at 77, *quoting Seely v. White Motor Co.*, 63 Cal.2d 9, 15, 45 Cal.Rptr. 17, 23, 403 P.2d 145, 151 (1965).

▪ This case is governed by the rules of commercial law for two reasons. First, even if the bull semen is considered to be defective, it is not unreasonably dangerous. Second, the Texas case law indicates that the policy rationale of contract law is to govern this situation.

## A. *Unreasonably Dangerous*

As noted earlier, strict liability in Texas has been defined to cover personal injuries and physical injuries to a consumer's other property caused by an *unreasonably dangerous* product. The test for determining what is unreasonably dangerous is different

depending on whether the case involves a flaw in a product or a design defect. This case presents a flaw in the product in that it was not improperly designed, but it arrived in a state which did not comport with its expected condition. In a flaw case, "unreasonably dangerous" is defined in terms of a consumer expectation test. Comment, *Special Project—Texas Tort Law in Transition*, 57 Texas L.Rev. 381, 470–71 (1979). A product is "unreasonably dangerous" when it is in a "defective condition rendering it unsafe for its intended use." *Metal Window Production Co. v. Magnusen*, 485 S.W.2d 355 (Tex.Civ.App.—Houston (14th Dist.) 1972, writ ref'd n. r. e.). A product is "unfit for its intended use" when it is "dangerous to an extent beyond that which would have been contemplated by the ordinary user with the knowledge available to him as to the characteristics of the product." [3]

*C.A. Hoover & Son v. O.M. Franklin Serum Co.*, 444 S.W.2d 596, 597 (Tex.1969); *see also Signal Oil*, 572 S.W.2d at 324 n.5 ("To be 'unreasonably dangerous' a product must be dangerous to an extent beyond that which would be expected by the ordinary petroleum refiner . . . with the ordinary knowledge common to the community of petroleum refiners as to the characteristics of such heaters."); *V. Mueller & Co. v. Corley*, 570 S.W.2d 140, 145 (Tex.Civ.App.—Houston (1st Dist.) 1978, writ ref'd n. r. e.) (dangerous "to an extent beyond that which would be contemplated by the ordinary user.").

 In a diversity case, a federal rather than a state test is applied to determine whether there is sufficient evidence to create a jury question as to whether a product is unreasonably dangerous. *Reyes v. Wyeth Laboratories*, 498 F.2d 1264 (5th Cir. 1974); *see also Boeing v. Shipman*, 411 F.2d 365 (5th Cir. 1969). A federal appellate court will avoid usurping the function of the jury by weighing evidence and judging credibility; our function is limited to determining whether there is a conflict in substantial evidence sufficient to create a jury question. *Borel v. Fireboard Paper Products Corporation*, 493 F.2d 1076 (5th Cir. 1973).

 Despite this stringent standard, we must still find that the bull semen was not unreasonably dangerous as a matter of law. There is no evidence supporting plaintiff's claim that the product was unreasonably dangerous in light of the proper "consumer expectation" test. The evidence showed that all bull semen has the possibility of carrying recessive genes. Two Rivers, as a cattle breeder, knew this. But most importantly, the evidence indicates that the "ordinary" cattle breeder with the ordinary knowledge common to the community of cattle breeders expects that the bull semen will carry some recessive genes. The industry custom is only to guarantee that (1) the semen is from the correct bull, (2) the bull is fertile, and (3) the semen will impregnate a heifer. The custom is that the risk of a genetic defect falls on the owner of the herd. This is especially true in the case of exotic breeds such as the Chianina. While custom is not dispositive, it is indicative of an ordinary consumer's expectations.

The evidence indicates that the presence of recessive genes in bull semen is contemplated by the ordinary consumer with knowledge of the product. All breeds possess genetic defects and all bulls possess some recessive genes. The testimony reveals that a cattle breeder accepts the risk of any unknown genetic defects and undiscovered abnormalities turning up in the offspring. The evidence indicates that the recessive gene carried by Farro was an unknown and undiscovered genetic defect. As soon as it was discovered, the Farro semen was taken off the market.

**3.** The district court in this case defined unreasonably dangerous to mean "some feature of the product threatens harm to the property of the users to the extent that such product would not be placed in the channels of commerce by a prudent seller or distributor aware of the risk involved in its use or to the extent that the product would not meet the reasonable expectations of the ordinary user as to safety to users property." This dual standard encompasses not only the consumer expectation test but also the prudent manufacturer test.

The evidence also revealed that several calves exhibiting syndactylism were stillborn. Each of the calves was the product of Farro bull semen. Therefore, it can be said that the evidence revealed the presence of a genetic defect in the Farro semen. But this is not evidence that the product is unreasonably dangerous. It says nothing concerning the contemplation of the ordinary consumer. It is not enough to find a defect without also finding that the defect is unreasonably dangerous. A product that is dangerous or defective, but no more dangerous than the ordinary consumer would expect does not trigger liability under section 402A. Comment, *Special Project* at 465.

Two Rivers may not recover damages under the doctrine of strict liability because the bull semen, as a matter of law, was not unreasonably dangerous. Therefore, this case must be governed by the doctrine of commercial law. But even if the bull semen is deemed to be unreasonably dangerous, this case is still governed by the policy rationale of commercial law.

### B. *Policy Rationale of Commercial Law*

In *Nobility Homes*, the Texas Supreme Court adopted the rule that economic loss resulting from a product with defective workmanship and materials only constituted a loss of value caused by the failure of the product to perform according to the contractual bargain. This represented economic loss and was not recoverable in strict liability. Strict liability was not designed to govern every sale of a faulty product. *Mid Continent*, 572 S.W.2d at 312. Commercial law governs the case where the purchaser has lost some of the benefit of his bargain.

This is clearly demonstrated in an analogous area involving the sale of seeds that are of inferior quality and seeds that will not germinate. *Pyle v. Eastern Seed Co.*, 145 Tex. 385, 198 S.W.2d 562 (1946); *Burchfield v. Tanner*, 142 Tex. 404, 178 S.W.2d 681 (1944); *Pioneer Hi-Bred International, Inc. v. Talley*, 493 S.W.2d 602 (Tex.Civ.App. —Amarillo 1973, no writ); *Asgrow Seed Co.*

*v. Gulick*, 420 S.W.2d 438 (Tex.Civ.App.— San Antonio 1967, writ ref'd n. r. e.); *Hall v. Mosteller*, 245 S.W.2d 338 (Tex.Civ.App. —Austin 1951, writ ref'd n. r. e.); *Dutch Mill Gardens v. Grullemans & Sons*, 238 S.W.2d 232 (Tex.Civ.App.—Galveston 1951, writ ref'd); *Texas Seed & Floral Co. v. Watson*, 160 S.W. 659 (Tex.Civ.App.—Dallas 1913, no writ); *Browne v. Allen*, 53 Tex.Civ.App. 458, 116 S.W. 133 (1909, no writ). Each of these cases involving a natural process was decided on the basis of commercial law. They indicate that the Texas Supreme Court would apply commercial law in this case that also involves a natural process. In the seed cases a "defect" in the seed resulted in a product that did not allow the purchaser to receive all the benefits of the bargain. The same can be said of this case where the genetic defect in the semen meant that Two Rivers did not receive all the benefits of its bargain with Curtiss.

The seed case that most closely resembles the fact situation presented here is *Pioneer Hi-Bred, supra.* In *Pioneer Hi-Bred*, the plaintiff complained of defective corn seed. While the "seeds planted well, came up to a good stand and the corn grew until it was approximately 'knee-high,'" the plants then turned yellow and failed to grow as uniformly as, or as tall as, or to produce as much corn as the purchaser had expected. The court stated that even if there was sufficient evidence to show a causative "defect" in the corn seed, any loss would be regarded only as economic loss due to failure of the product with respect to its own value. While the seed was defective, the damage was to the resulting corn plant. The same is true in this case where the defect in the semen caused injury to some of the resulting calves. The court in *Pioneer Hi-Bred* found that the injury to the corn was not "physical harm   .  .  . caused to the ultimate user or consumer, or to his property" within the language of section 402A. The same can be said in this case of the injury to the calves. We choose to follow the reasoning of the court in *Pioneer Hi-Bred* and apply it to this case. The loss is deemed as economic loss only.

*See also Texsun Feed Yards, Inc. v. Ralston Purina Co.*, 447 F.2d 660 (5th Cir. 1971) (this court applied the same rule to cattle feed supplement where the defect caused the supplement to be less effective than anticipated).

The loss claimed by Two Rivers, represented by the decrease in market value of the herd, can best be described as an intangible commercial loss. Keeton, *Private Law Torts*, 25 SW.L.J. 1 (1971). This description encompasses (1) economic losses generally measured by the cost of repair or replacement, (2) losses measured by the difference in market value of the product without the defect and its value diminished by its existing defective condition, (3) losses measured by the difference in value between what is given and received, as well as (4) indirect or consequential losses measured by a loss of profits. Sales & Perdue, *The Law of Strict Tort Liability in Texas*, 14 Hous.L.Rev. 1,144 (1977). Consistent with this category of losses is a loss represented by a reduction in the market value of a herd of cattle caused by the stigma of a recessive gene. This is a commercial loss that does not allow the application of strict liability.

Essentially, Two Rivers is complaining, as a purchaser of bull semen, that the product did not fulfill its commercial expectations. Two Rivers purchased the semen to artificially inseminate its half-blood Chianina heifers and to eventually create a purebred Chianina herd. This goal can still be achieved. The Farro semen had an acceptable conception rate. The only problem is that Two Rivers desired semen that was free of all genetic abnormalities. The presence of the recessive gene meant that the product did not fulfill Two Rivers' commercial expectations. The policy reasons behind strict liability are simply not compelling in the case of a disappointed buyer. *Id.* at 149. Two Rivers' case is even less compelling than the situation presented in *Nobility Homes* where the unfulfilled expectations made the mobile home uninhabitable. At least in this case, the semen performed according to the contractual bargain. It merely possessed one undesirable characteristic that arguably caused a loss of value.

The Farro bull semen satisfied Two Rivers' business demands since it had a satisfactory conception rate. It did not cause physical harm to individuals or to Two Rivers' dams or bulls. Strict liability evolved to provide a remedy for physical injuries. It was not designed to replace the U.C.C. in governing commercial transactions. The damages claimed by Two Rivers are not the type protected by the social policy of strict liability to protect consumers and distribute the costs to the consuming public. The public need not be burdened with additional costs because of a consumer's unfulfilled commercial expectations. The socio-economic policy and enterprise theory behind strict liability was not designed to provide a remedy for a disappointed buyer. Sales & Perdue, *supra*, at 148–49. This is a case of economic loss that must be governed by commercial law.

## IMPLIED WARRANTY

Because this case presents a situation involving the principles of commercial law, the provisions of the Uniform Commercial Code govern the outcome. *Nobility Homes, supra*; *Mid Continent, supra*. The U.C.C. was designed to deal with obligations imposed by law for commercial losses and it provides both express and implied warranties. Two Rivers does not claim that Curtiss made an express warranty, but it does contend that the judgment of the trial court may be affirmed on the theory of breach of an implied warranty.

The U.C.C. provides for two implied warranties including an implied warranty of merchantability and an implied warranty of fitness for a particular purpose. An implied warranty of merchantability arises from a merchant seller with respect to goods of the kind that he normally sells. Tex.Bus. & Comm.Code Ann. § 2.314 (Vernon 1968). For goods to be merchantable, they must be fit for the ordinary purposes for which the goods are ordinarily used. *Id.* § 2.314(b)(3). An implied warranty of fitness for a particular purpose

arises when the seller, at the time of contracting, has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods. Tex.Bus. & Comm.Code Ann. § 2.315 (Vernon 1968).

■ Because Curtiss is a merchant seller dealing in bull semen, it impliedly warranted that its goods would be fit for the *ordinary purposes* for which they are ordinarily used. After *Nobility Homes*, it is clear that this warranty extends to Two Rivers despite the absence of privity of contract between Curtiss and Two Rivers. But Curtiss did not impliedly warrant the fitness of the bull semen for a *particular purpose.* Two Rivers did not rely on Curtiss to select the particular semen involved but relied on Tony Hall. Therefore, Two Rivers must rely on the implied warranty of merchantability to support a recovery of damages for economic loss.

■ Two Rivers pleaded and the trial court found that Curtiss breached its implied warranty of merchantability to Two Rivers by distributing a product that was not fit for the purpose of artificially inseminating cattle. Without addressing the validity of this conclusion, we find that this case may be decided on the issue of disclaimer of warranty. To disclaim an implied warranty of merchantability, the disclaimer must (1) mention the word merchantability and (2) in the case of a writing, must be conspicuous.

■ Each sale from Curtiss to Hi-Pro included a disclaimer of all warranties, express or implied, using the following language:

Notwithstanding the fact that artificial insemination is successfully employed in the breeding of livestock on a worldwide basis and Curtiss customers for many years have achieved satisfactory results, Curtiss Breeding Service, a division of Searle Agriculture, Inc., and its agents or employees cannot guarantee the conception rate, quality or productivity to be obtained in connection with the use of its products or recommended techniques. Curtiss does warrant that all semen sold will be processed according to standards recommended by the American Veterinary Medical Association and adopted by the National Association of Animal Breeders. IT MAKES NO OTHER WARRANTY OF ANY KIND AND HEREBY DISCLAIMS ALL WARRANTIES, BOTH EXPRESS AND IMPLIED, OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

Further, neither Curtiss Breeding Service, nor any of its agents or employees, shall be responsible for any injury or damage caused to persons, animals or property through the negligent use or handling of its products, or for any damages or loss due to any defects in the containers used in connection therewith.

This language appeared in large type on the back of each invoice Hi-Pro received from Curtiss when it purchased bull semen. This disclaimer was also conveyed from Curtiss, through Hi-Pro, to Tony Hall when he purchased the Farro semen. The same language was printed on page two of the "1974 Curtiss Beef Breeding Guide." The record indicates that Hall examined page two of the Guide and noticed the conspicuous disclaimer of warranty.

■ The only remaining question is whether the disclaimer that was effective against Hi-Pro and Hall could be extended to Two Rivers. While Hall purchased the semen on his own account, he did so for the benefit of Two Rivers. Hall cannot be considered a seller of bull semen. The testimony reveals that Hall merely had the semen billed to his account and that he was later reimbursed by Two Rivers in an amount equal to his cost. At least to this extent, Hall was an agent of Two Rivers. Hall also charged Two Rivers a nominal fee for the services he performed. We hold that the relationship between Hall and Two Rivers requires a finding that the disclaimer effective against Hi-Pro and Hall was also effective as to Two Rivers. *Cf. Sugarland Industries, Inc. v. Falco*, 360 S.W.2d 806 (Tex. Civ.App.—Waco 1962, writ ref'd n. r. e.).

Therefore, the implied warranty of merchantability was properly disclaimed and Two Rivers is not entitled to recover any damages.

We find additional support for the manner in which Texas courts have analyzed this problem from the Supreme Court of Oregon in *Brown v. Western Farmers Ass'n*, 268 Or. 470, 521 P.2d 537 (1974). In *Brown*, plaintiff sought to recover damages based on strict liability for the loss of eggs caused to taste bad, for loss of chickens caused to become valueless and which had to be replaced, for the cost of defective feed, and for lost profits against a retailer of chicken feed because the feed was defective. While the Oregon Supreme Court did not reach the question of economic loss, it held that an action for damages by the purchaser of defective goods brought on a theory of strict liability is proper only when the defective goods are unreasonably dangerous to the user or his other property. There was no showing that the feed was unreasonably dangerous. As in this case, strict liability could not be relied upon to recover for a decrease in the value of property or for other forms of economic loss.

In summary, in Texas the type of loss presented in this case is governed by the U.C.C. and the law of warranty. But Curtiss successfully disclaimed any and all implied warranties in this case. Therefore, the district court incorrectly allowed Two Rivers to receive damages based on the theories of strict liability and breach of an implied warranty of merchantability.

REVERSED.

TATE, Circuit Judge, dissenting:

I respectfully dissent.

The majority's persuasive opinion is thoughtful and scholarly. However, like the district judge whom we reverse, my *Erie* guess is that, in the particular configuration of facts before us, the Texas courts would hold that strict liability recovery is allowable.

As acknowledged by the majority, the chief difficulty in the present legal characterization of the "product," the "defect," and the "economic loss" arises from the nature of the present product and its defect, unique in jurisprudence to date concerning strict liability for product defects. The "product" is commercially-sold semen, here used for artificial insemination of the heifers in a fine herd of one hundred breeding cattle. The "defect" in this product was a recessive gene of syndactylism, a genetic abnormality that results in the birth of deformed or stillborn calves (when both dam and sire have the recessive genes). All the calves sired by Farro suffered damage from this recessive gene, four dying stillborn and twenty-two becoming carriers of the syndactylism gene. In my view, my brothers of the majority improperly disallow this damage as being purely an "economic loss," a loss of market value of the "product."

The damage to these calves, though partially measured in terms of loss of market value, is not an "economic loss" in the technical sense used in the Texas products liability cases. Tort-recovery for physical damage to an automobile caused by a third person's negligence could similarly be described as an "economic loss," because such damage can be measured by the difference between the automobile's market value before and after the tort-caused damage. Moreover, aside from any technical conceptual characterization based solely on the measure of damage, the judicial determination of strict liability in tort should be based upon the nature of the loss and upon whether recovery is appropriate in the light of the purposes of strict liability for defective products. In my view, the damage here suffered is appropriately recovered under strict liability.

The majority valiantly struggles with the three most recent Texas cases discussing strict liability recovery for "economic loss" resulting from a product's defect, *Signal Oil and Gas Co. v. Universal Products*, 572 S.W.2d 320 (Tex.1978); *Mid Continent Aircraft Corp. v. Curry County Spraying Service, Inc.*, 572 S.W.2d 308 (Tex.1978); *Nobility Homes of Texas, Inc. v. Shivers*, 557

S.W.2d 77 (Tex.1977), and admits that none of these cases control the present circumstances. However, my brothers of the majority conclude that strict liability is not appropriate in this case because they believe that the semen was not unreasonably dangerous and that the facts of this case do not fall within the policy rationale of strict liability and the economic loss cases. It is with these two conclusions that I respectfully disagree.

To begin with, I believe that the majority errs in determining that, *as a matter of law*, the semen in this case was not unreasonably dangerous. As stated in *Reyes v. Wyeth Laboratories*, 498 F.2d 1264, 1288 (5th Cir. 1974) (italics ours), "As an appellant court, our sole function is to ascertain whether there is *a rational basis in the record for the jury's verdict*; we are forbidden to usurp the function of the jury by weighing the conflicting evidence and inferences and then reaching our own conclusion." I believe that the conclusion reached by the jury has a rational basis.

Although the evidence indicates that purchasers of bull semen are aware that there may be some recessive genes, the jury was not compelled to excuse the distributor from liability for damage directly resulting from a defective gene that essentially destroyed the value of the calves for which the semen had been purchased. Four of the calves died in their mothers' wombs, and the calves that became carriers of the defective gene lost all value except for purposes of slaughter.[1] This sort of fatal result is far beyond any custom or consumer expectation. I think that the majority errs in holding that the jury was not, *as a matter of law*, entitled to conclude that a genetic defect of this magnitude was unreasonably dangerous.

With respect to whether the damage suffered by the calves in this case is recoverable under strict liability as opposed to being simply an "economic loss," I think that the most applicable cases are *Signal Oil and Gas Co. v. Universal Products Inc.*, 572 S.W.2d 320 (Tex.1978), and *C. A. Hoover and Son v. O. M. Franklin Serum Company*, 444 S.W.2d 596 (Tex.1969).[2] In *Signal Oil* a defective heater (the product) exploded, causing damage not only to itself but also to the rest of the refinery (other property). There, in upholding a products liability cause of action for all damages thereby sustained, the Texas court held that products liability recovery is available where "collateral property damage exists in addition to damage to the product itself," 572 S.W.2d at 320. In my opinion, the semen should be classified as the "product" and the defective calves as "other property" that was damaged. (Only by conceptualizing the "product" as *both* the semen sold and the calves thereafter conceived and nurtured in the heifers' wombs until born months later, may the present facts be forced into the *Mid Continent* formula so as to deny recovery.)

Unlike the majority, I believe that analogizing to the *Signal Oil* decision reaches a result that is consistent with the policy behind strict liability and the cases that have distinguished purely "economic loss" from other types of damage. In the seed cases relied on by the majority, the product simply failed to perform as expected. In the instant case, however, as in *Signal Oil* and *C. A. Hoover*, the defect in the product has caused physical injury to the other property of the purchaser. In the instant case the injury is no less a "physical injury" because produced by the injection of recessive genes than if, instead, permanent injury to the calves had been caused by the injection of defective serum, as in *C. A. Hoover*.[3]

The real issue, as the majority remarks in closing, is whether this type of damage should be borne by the consumer (as merely his unfulfilled commercial expectation), or should instead be borne by the distributor of a product presenting an unreasonably

---

1. As noted in footnote 1 of the majority opinion, the value of the female calves that became carriers was reduced from $725 to $125.

2. In *C. A. Hoover* strict liability tort recovery was allowed when impure serum caused death and permanent injuries to calves.

3. See note 2, *supra*.

dangerous risk of injury to the property of others (in order to protect individual consumers from unwarranted loss and to spread the risk among the consuming public). The issue is close, but in my view the Texas supreme court, more likely than not, would allow products liability recovery in this case and hold that the distributor of this defective semen is strictly liable for the damages it caused.

Therefore, I would allow products liability recovery at least the damages resulting from (a) the loss of the four calves stillborn due to Farro's unreasonably dangerous semen and (b) the loss in value of the 22 calves due to their being born afflicted by the defect resulting from such semen. Accordingly, I respectfully dissent.