Preston B. PURVIS, Appellee,

v.

CONSOLIDATED ENERGY PRODUCTS COMPANY, a division of Condec Corporation, Appellant.

No. 81–1107.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 8, 1981.

Decided March 8, 1982.

Rehearing and Rehearing En Banc Denied April 15, 1982.

William L. Rikard, Jr., Sydnor Thompson, Charlotte, N.C. (M. Craig Garner, Jr., Columbia, S.C., on brief), for appellant.

James T. McBratney, Jr., Florence, S.C. (Thomas E. Rogers, Jr., Florence, S.C., on brief), for appellee.

Before HARRISON L. WINTER, Chief Judge, ALBERT V. BRYAN, Senior Circuit Judge, and K. K. HALL, Circuit Judge.

HARRISON L. WINTER, Chief Judge:

Lacking a controlling state authority, we are called upon in this diversity case to decide whether, under the law of South Carolina, a plaintiff engaged in the business of raising and curing tobacco can recover under South Carolina's strict liability statute, S.C.Code § 15–73–10 (1976), for losses to his crops allegedly caused by a defective curing barn purchased from the defendant. The district court denied defendant's motion for summary judgment and submitted the case to the jury, ruling that recovery under the statute was permissible. From the judgment entered upon the jury's verdict for plaintiff, defendant appeals. Because we think that South Carolina would not permit recovery under the statute in the circumstances of this case, we reverse.

I.

Plaintiff, Preston B. Purvis, owns and operates a farm of approximately 600 acres in three counties of South Carolina. His principal crop is tobacco. He has been engaged in this occupation for at least nineteen years, sometimes sharing the responsibility for raising tobacco with sharecroppers, but at all times having sole responsibility for curing tobacco.

Prior to 1977, plaintiff used conventional stick barns to cure his tobacco.[1] In 1977, plaintiff switched to a specially-built barn with metal construction that used the stick method of placing the tobacco leaves in the barn. He then decided to purchase other bulk curing barns of metal construction, which used loading methods different from sticks and offered the possibility of substantial gains in efficiency, particularly through labor saving. To that end he investigated the bulk curing barns of several manufacturers. In January 1978, plaintiff met with a representative of defendant, Consolidated Energy Products Company, which manufactured the "Conto" barn, and after several hours of discussion, he purchased six Conto barns. Under the sales contract, defendant warranted that the barns would be free from defects in parts and workmanship and confined plaintiff's remedies to the repair or replacement of defective parts.

Plaintiff first put the new Conto barns to use in the summer of 1978 together with a tobacco harvester of a type he had not previously employed. His first experience with the barns was not satisfactory and he sought defendant's help in improving subsequent cures. Although defendant's representatives sought to give aid, plaintiff's experience with the barns through the remainder of the season remained unsatisfactory.[2]

---

1. Conventional stick barns are wooden barns in which tobacco leaves are hung, after being tied to sticks with string, in order for air heated by oil furnaces to circulate among them and cure them.

2. Defendant's evidence at trial, which we need not recount, offered a variety of explanations for plaintiff's unsatisfactory cures. It suggested that the tobacco was diseased and infested with insects and that plaintiff loaded the barns improperly. Plaintiff presented proof that, even with proper loading, the barns were not satisfactory because of their inability to effect a proper airflow to cure the tobacco.

Finally, in 1979, plaintiff brought this suit. He alleged causes of action for fraud, breach of express and implied warranties, and strict products liability. Defendant moved for summary judgment as to all causes of action. Ruling on the motion was deferred and the jury was permitted to hear evidence. The district court later directed verdicts for defendant on the fraud and breach of warranty counts but submitted the case to the jury on the strict products liability claim. No appeal is taken with respect to the verdicts which were directed. This appeal is limited to the judgment entered upon the jury's verdict of $57,722.94 for plaintiff on his strict products liability cause of action.

## II.

South Carolina's strict products liability statute, S.C.Code § 15–73–10 (1976), is an enactment of section 402A of the Restatement (Second) of Torts (1965).[3] Under the statute, one who sells a dangerously defective product is liable without fault to a user or consumer thereof who suffers physical injury to his person or property as a result of the defect.[4] Plaintiff invoked this doctrine on the theory that a design defect in the airflow system of defendant's curing barns caused physical harm to tobacco which plaintiff attempted to cure.

At the outset we are faced with a dearth of South Carolina authority as to whether the South Carolina statute would permit recovery by a buyer where the product was purchased from the seller in the ordinary course of their respective businesses. South Carolina has no certification statute. It becomes our duty, therefore, to determine how the Supreme Court of South Carolina would decide the issue if and when that issue were to come before it. We make that prediction on the basis of the rationale of the doctrine of strict products liability and its application in other jurisdictions.

The doctrine of strict products liability in tort was created "to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves." *Greenman v. Yuba Power Products, Inc.*, 59 Cal.2d 57, 377 P.2d 897, 901, 27 Cal.Rptr. 697 (1963). *See Brown v. General Motors Corp.*, 355 F.2d 814, 821 (4 Cir. 1966), *cert. denied*, 386 U.S. 1036, 87 S.Ct. 1474, 18 L.Ed.2d 600 (1967); Restatement (Second) § 402A, Comment c ("public policy demands that the burden of accidental injuries caused by products intended for consumption be placed upon those who market them, and be treated as a cost of production against which liability insurance can be obtained"). By shifting certain product-related losses from consumers and users to manufacturers, the doctrine both promotes fairness and provides manufacturers with a disincentive to market unreasonably dangerous products. *See Escola v. Coca Cola Bottling Co.*, 24 Cal.2d 453, 150 P.2d 436, 440–41 (1944) (Traynor, J., concurring in the judgment).

---

**3.** The statute incorporates as declarative of legislative intent the comments accompanying section 402A of the Restatement (Second) of Torts (1965) [hereinafter cited without cross-reference as Restatement (Second)]. S.C.Code § 15–73–30 (1976). For convenience, this opinion will hereafter refer to section 402A of the Restatement (Second) and the accompanying comments rather than to the corresponding sections of the South Carolina Code.

**4.** The Restatement (Second) provides:

    *Special Liability of Seller of Product for Physical*
    *Harm to User or Consumer*

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

    (a) the seller is engaged in the business of selling such a product, and

    (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

    (a) the seller has exercised all possible care in the preparation and sale of his product, and

    (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

Restatement (Second) § 402A.

■ One of the purposes of strict products liability is to restrict the degree to which manufacturers may define their own legal responsibilities by means of the commercial law of warranties.[5] Strict products liability, however, has not completely displaced warranty theory. The Supreme Court of California, which pioneered the development of strict products liability, acknowledged this in *Seely v. White Motor Co.*, 63 Cal.2d 9, 403 P.2d 145, 45 Cal.Rptr. 17 (1965). The *Seely* court held that a plaintiff claiming lost profits resulting from a product defect must rely on warranty theory rather than strict products liability. The court observed:

In [*Greenman v. Yuba Power Products, Inc.*] we recognized only that "rules defining and governing warranties that were developed to meet the needs of commercial transactions cannot properly be invoked to govern the manufacturer's liability to those injured by its defective products unless those rules also serve the purposes for which such liability is imposed." . . . Although the rules governing warranties complicated resolution of the problems of personal injuries, there is no reason to conclude that they do not meet "the needs of commercial transactions." The law of warranty "grew as a branch of the law of commercial transactions and was primarily aimed at controlling the commercial aspects of these transactions." . . .

Although the rules of warranty frustrate rational compensation for physical injury, they function well in a commercial setting. . . . These rules determine the quality of the product the manufacturer promises and thereby determine the quality he must deliver. . . .

. . . .

. . . A consumer should not be charged at the will of the manufacturer with bearing the risk of physical injury when he buys a product on the market. He can, however, be fairly charged with the risk that the product will not match his economic expectations unless the manufacturer agrees that it will.

403 P.2d at 149–51, 45 Cal.Rptr. at 21–23 (citations omitted).

Although *Seely* dealt specifically with a claim of intangible injuries, it has led to the recognition that the policies of strict products liability are generally inapplicable to purely commercial matters. The leading case in point is *Kaiser Steel Corp. v. Westinghouse Electric Corp.*, 55 Cal.App.3d 737, 127 Cal.Rptr. 838 (1976). Kaiser sought to impose on Westinghouse strict liability for the sale of a defective generator intended for use in a steel mill. Westinghouse defended on the ground that it sold the generator under an agreement limiting its liability for defects to repair or replacement and relieving it of responsibility for consequential damages. The trial court refused to render summary judgment for Westinghouse, but the California Court of Appeal reversed. The court held: "[T]he doctrine of products liability does not apply as between parties who: (1) deal in a commercial setting; (2) from positions of relatively equal economic strength; (3) bargain the specifications of the product; and (4) negotiate concerning the risk of loss from defects in it." 55 Cal.App.3d at 748, 127 Cal. Rptr. 838 (citing *Southwest Forest Industries, Inc. v. Westinghouse Electric Corp.*, 422 F.2d 1013 (9 Cir.), *cert. denied*, 400 U.S. 902, 91 S.Ct. 138, 27 L.Ed.2d 138 (1970)); *accord, Scandanavian Airlines System v. United Aircraft Corp.*, 601 F.2d 425, 428–29 (9 Cir. 1979); *Ebasco Services, Inc. v. Pennsylvania Power & Light Co.*, 460 F.Supp. 163, 226 (E.D.Pa.1978).

■ *Kaiser Steel Corp.* and its progeny recognize that the considerations of fairness and deterrence underlying strict products liability are anomalous when extended to commercial parties who have allocated the risk of product defects between themselves. *Kaiser Steel Corp.*, 55 Cal.App.3d at 748, 127 Cal.Rptr. 838; *see Scandanavian Airlines System*, 601 F.2d at 428. The consumer who purchases a product on the mass

5. Section 402A relieves the plaintiff of the notice and privity requirements of warranty theory. Restatement (Second) § 402A, Comment m.

market has little opportunity to protect himself from injury by product defects that do not come to light by casual inspection. By contrast, the commercial buyer can protect himself by negotiation.[6] He can induce the seller to accept, for a price, risks which the buyer cannot bear efficiently himself. Conversely, by relieving the seller of responsibility for product defects, the commercial buyer is likely to obtain the product at a lower price. When a buyer who has taken advantage of that opportunity invokes strict products liability with respect to a risk that was allocated to him by contract, he in effect asks the law to accord him a better bargain than he purchased.[7]

Reasoning like that employed in *Kaiser Steel Corp.* has led several courts to the conclusion that contractual disclaimers of warranties and limitations of remedies preclude strict products liability where such provisions satisfy applicable rules of commercial law.[8] *See Tokio Marine & Fire Insurance Co. v. McDonnell Douglas Corp.,* 617 F.2d 936, 939–40 (2 Cir. 1980); *Idaho Power Co. v. Westinghouse Electric Corp.,* 596 F.2d 924, 927–28 (9 Cir. 1979); *Posttape Associates v. Eastman Kodak Co.,* 537 F.2d 751, 756 (3 Cir. 1976); *Delta Air Lines v. McDonnell Douglas Corp.,* 503 F.2d 239, 245 (5 Cir. 1974), *cert. denied,* 421 U.S. 965, 95

S.Ct. 1953, 44 L.Ed.2d 451 (1975); *Keystone Aeronautics Corp. v. R. J. Enstrom Corp.,* 499 F.2d 146, 149 (3 Cir. 1974). *Contra, Sterner Aero AB v. Page Airmotive, Inc.,* 499 F.2d 709, 713 & n.2 (10 Cir. 1974). The majority holds that the considerations which make it impermissible for manufacturers to disclaim liability for injuries to consumers do not extend to commercial parties who have negotiated the terms of their relationship. As the Third Circuit remarked in *Keystone Aeronautics*:

A social policy aimed at protecting the average consumer by prohibiting blanket immunization of a manufacturer or seller through the use of standardized disclaimers engenders little resistance. But when the setting is changed and the buyer and seller are both business entities, in a position where there may be effective and fair bargaining, the social policy loses its *raison d'etre.*

499 F.2d at 149 (footnote omitted).

Because strict products liability arises from considerations of public policy rather than from the parties' intent, the notion that such liability can be avoided by contractual disclaimers is problematical. *See Seely v. White Motor Co.,* 63 Cal.2d 9, 403 P.2d 145, 150, 45 Cal.Rptr. 17 (1965). *See*

---

**6.** It should also be noted that a commercial buyer who purchases a product from the manufacturer is in privity with the manufacturer and thus faces "no artificial barrier to recovery." *Kaiser Steel Corp.,* 55 Cal.App.3d at 748, 127 Cal.Rptr. 838. Furthermore, because warranty liability is itself "strict," the buyer can recover without proof of fault if he shows that the risk which materialized and caused him injury was expressly or impliedly allocated to the seller.

**7.** Considerable mischief would result if strict products liability were held to oust completely the rules of commercial law regarding product defects. *See generally,* Speidel, *Products Liability, Economic Loss and the UCC,* 40 Tenn.L. Rev. 309 (1973). To hold a manufacturer accountable for all commercial losses resulting from a product defect would impose risks of a magnitude the manufacturer could neither know nor control. *See Seely v. White Motor Co.,* 63 Cal.2d 9, 403 P.2d 145, 150–51, 45 Cal.Rptr. 17 (1965). The high cost of absorbing or insuring against such risks would surely raise the manufacturer's prices and lower his output. That result is desirable where the manufacturer's products are unreasonably dan-

gerous. As will be discussed in the text, however, it is not the function of strict products liability to treat manufacturers as insurers of the risk that their products will prove ineffective, as opposed to unsafe.

**8.** South Carolina has enacted provisions of the Uniform Commercial Code which permit the disclaimer of warranties and limitation of remedies. *See* S.C.Code §§ 36–2–316, 2–719 (1976). In particular, the Code provides: "Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. *Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable, but limitation of damages where the loss is commercial is not." Id.* § 36–2–719(3) (emphasis added). The italicized language demonstrates that the distinction relied upon in *Kaiser Steel Corp.* and related cases between consumer and commercial transactions has a basis in the U.C.C. as well as in the history and policies of the doctrine of strict products liability.

*generally* Restatement (Second) § 402A, Comment m. Where these policy considerations are inapplicable, however, the doctrine of strict products liability affords no basis for setting aside contractual limitations on the plaintiff's claim. Furthermore, there are strong positive reasons for courts to respect such limitations. The right to disclaim warranties and limit remedies enables commercial parties to allocate risks between the buyer and the seller in the most efficient manner and thereby to maximize their respective gains from a transaction. Furthermore, because that right is often embodied in statutory law, failure by the courts to give it due effect would flout a clear legislative mandate.[9] *See Kaiser Steel Corp. v. Westinghouse Electric Corp.*, 55 Cal.App.3d 737, 747, 127 Cal.Rptr. 838 (1976); *Eli Lilly & Co. v. Casey*, 472 S.W.2d 598, 600 (Tex.Civ.App.1971); Titus, *Restatement (Second) of Torts Section 402A and the Uniform Commercial Code*, 22 Stan.L. Rev. 713, 755 (1970).

■ To recognize that the policies of strict products liability do not ordinarily extend to the commercial setting is not to suggest that a defective product can never give rise to strict liability as between commercial parties. *See, e.g., Signal Oil & Gas Co. v. Universal Oil Products*, 572 S.W.2d 320 (Tex.1978). It is the nature of the risk that caused injury, rather than the nature of the parties, which is finally determina-

tive. *See Russell v. Ford Motor Co.*, 281 Or. 587, 575 P.2d 1383, 1386–87 (1978). Under the formulation of the Restatement (Second), the policies of strict products liability come into play only as to products "in a defective condition unreasonably dangerous to the user or consumer or to his property." Restatement (Second) § 402A.[10] To be unreasonably dangerous within the meaning of section 402A, a defective product "must be dangerous to an extent beyond that which would be contemplated by the ordinary purchaser who purchases it, with the ordinary knowledge common to the community as to its characteristics." *Id.*, Comment i.

■ All products carry the risk that they will serve their intended function poorly. In this sense, the risk of "ordinary" malfunction is well within the contemplation of the average purchaser. *See Two Rivers Co. v. Curtiss Breeding Service*, 624 F.2d 1242, 1249 (5 Cir. 1980), *cert. denied*, 450 U.S. 920, 101 S.Ct. 1368, 67 L.Ed.2d 348 (1981); *Young v. Tide Craft, Inc.*, 270 S.C. 453, 242 S.E.2d 671, 679–80 (1978). This view comports with common sense as well as with the underlying purpose of strict products liability, which is to protect consumers from products which are unreasonably unsafe, not from those which are merely ineffective. *See Two Rivers Co.*, 624 F.2d at 1248–51; *Posttape Associates v. Eastman Kodak*

---

**9.** *See* note 8 *supra.*

**10.** Some courts hold that a plaintiff who proves that he was injured by a product defect may recover under the doctrine of strict products liability without showing, as a separate element of proof, that the defect was unreasonably dangerous. *Cronin v. J.B.E. Olson Corp.*, 8 Cal.3d 121, 501 P.2d 1153, 1161–62, 104 Cal.Rptr. 433 (1972); *accord, Butaud v. Suburban Marine & Sporting Goods, Inc.*, 543 P.2d 209, 214 (Alaska 1975). Other courts require proof that the product is both defective and unreasonably dangerous. *E.g., Brown v. Western Farmers Assoc.*, 268 Or. 470, 521 P.2d 537, 539–41 (1974); *Nobility Homes, Inc. v. Shivers*, 557 S.W.2d 77, 79–80 (Tex.1977).

We think that the language of section 402A of the Restatement (Second) favors the latter position. To our knowledge, moreover, the Supreme Court of South Carolina has never applied strict products liability in a case not in-

volving an extraordinary hazard or accident. Although that court may some day decide that unreasonable dangerousness is not an element of a section 402A claim, existing precedents afford us no basis for anticipating such a development. It is arguable, furthermore, that a showing of unreasonable dangerousness is especially important where a commercial party seeks to recover for property damages. In that setting, the element of unreasonable dangerousness aids the courts in distinguishing tort damages from mere losses of economic expectations which are properly adjusted under the law of contracts and commercial transactions. *See, e.g., Two Rivers Co. v. Curtiss Breeding Service*, 624 F.2d 1242, 1248–51 (5 Cir. 1980), *cert. denied*, 450 U.S. 920, 101 S.Ct. 1368, 67 L.Ed.2d 348 (1981); *Northern Power & Engineering Corp. v. Caterpillar Tractor Co.*, 623 P.2d 324, 328–29 (Alaska 1981); *Nobility Homes, Inc. v. Shivers*, 557 S.W.2d at 79–80.

*Co.*, 537 F.2d 751, 754–55 (3 Cir. 1976); *Texsun Feed Yards, Inc. v. Ralston Purina Co.*, 447 F.2d 660, 666–67 (5 Cir. 1971); *Northern Power & Engineering Corp. v. Caterpillar Tractor Co.*, 623 P.2d 324 (Alaska 1981); *Brown v. Western Farmers Association*, 268 Or. 470, 521 P.2d 537, 542 (1974); *Nobility Homes, Inc. v. Shivers*, 557 S.W.2d 77, 79–80 (Tex.1977). When a loss results from mere product ineffectiveness, it is the law of contracts and commercial transactions, rather than strict products liability, which fixes responsibility for the loss. *See generally Seely v. White Motor Co.*, 63 Cal.2d 9, 403 P.2d 145, 149–50, 45 Cal.Rptr. 17 (1965).

### III.

■ The foregoing principles clearly indicate that strict products liability does not apply in the case before us. Under defendant's sales agreement with plaintiff, defendant warranted only that its curing barns would be free from defects in parts and workmanship and confined plaintiff's remedies to the repair or replacement of defective parts. Following *Kaiser Steel Corp. v. Western Electric Co.*, 55 Cal.App.3d 737, 127 Cal.Rptr. 838 (1976), and its progeny, we hold that strict products liability does not extend to this transaction.[11]

■ The district court recognized the validity of the contractual disclaimers and limitations as a matter of commercial law. It nevertheless ruled that those contractual provisions were no bar to strict products liability. This was error. Arguably, the doctrine of strict products liability would override the contract if the defect which allegedly caused plaintiff's injury invoked the policies of that doctrine. Those policies, however, have no role in this dispute, for the alleged defect in defendant's curing

barns was not unreasonably dangerous to plaintiff or his property.

Plaintiff's evidence may have demonstrated that the barns performed their intended task poorly, but it did not establish that they posed a safety hazard. A showing that the barns caused physical injury to tobacco by failing to cure it does not establish that the barns were unreasonably dangerous to property. *Cf. Scandanavian Airlines System v. United Aircraft Corp.*, 601 F.2d 425 (9 Cir. 1979) (enforcing contractual disclaimers and refusing to impose strict liability on the manufacturer of airplane engines which caused physical damage to airplanes). Giving plaintiff the benefit of all favorable inferences, we conclude that it was an ordinary commercial risk of product ineffectiveness which caused his loss. Accordingly, the doctrine of strict products liability as formulated in section 402A of the Restatement (Second) provides no justification for shifting plaintiff's loss to defendant. *See, e.g., Two Rivers Co. v. Curtiss Breeding Service*, 624 F.2d 1242, 1248–50 (5 Cir. 1980), *cert. denied*, 450 U.S. 920, 101 S.Ct. 1368, 67 L.Ed.2d 348 (1981); *Texsun Feed Yards, Inc. v. Ralston Purina Co.*, 447 F.2d 660, 666–67 (5 Cir. 1971). As the court observed in *Brown v. Western Farmers Association*: "[T]he term 'unreasonably dangerous,' as used in Section 402A as the basis for the imposition of strict liability ... was not intended to be so 'watered down' as to extend to any defect which in any way may decrease the value of property ...." 268 Or. 470, 521 P.2d 537, 542 (1974).

REVERSED.

K. K. HALL, Circuit Judge, dissenting:

The majority determination that the plaintiff is a commercial buyer dealing with

---

**11.** To be sure, not all of the factors enumerated in *Kaiser Steel Corp.* are present here. Plaintiff apparently took defendant's standard product rather than negotiating detailed specifications. It might be argued, moreover, that in some absolute sense, plaintiff (a sole proprietor) did not have bargaining power equal to that of defendant. Both points are insignificant. Whether a manufacturer sells a product "off the rack" or according to specifications has no bearing on whether the policies of strict liability attach to the product. Relative bargaining power is likewise irrelevant, with the possible exception of situations in which the seller is able to impose an adhesion contract. *See Seely v. White Motor Co.*, 63 Cal.2d 9, 403 P.2d 145, 151, 45 Cal.Rptr. 17 (1965) ("The law of warranty is not limited to parties in a somewhat equal bargaining position. Such a limitation .... finds no support in Greenman.").

the defendant from a position of relatively equal economic strength is the thread from which the remaining legal conclusions in its opinion hang. If I could agree with that finding I would have less trouble with the majority opinion. In any event, I must respectfully dissent because I cannot agree that Purvis' tobacco farming constitutes the type of "commercial" activity that precludes application of South Carolina's strict products liability statute, S.C.Code § 15–73–10 (1976). While in its broadest sense the meaning of "commercial" could include any activity intended to yield a profit, in common parlance the term is generally associated with manufacturing or retail activities. It is an unfair interpretation to equate Purvis' relatively small farming operation with traditional business activities.

The majority relies primarily on *Kaiser Steel Corp. v. Western Electric Co.*, 55 Cal. App.3d 737, 127 Cal.Rptr. 838 (1978), for the rule that commercial transactions are exempt from the doctrine of strict products liability. However, even if we accept "commercial activity" to include farming, we should not extend that rule to the situation at hand. A close reading of *Kaiser* and its progeny,[1] reveals only that "the doctrine of strict liability does not apply between *large corporate enterprises* which have allocated risks by contract." *S. A. Empresa De Viacao Aerea Rio Grandense v. Boeing Co.*, 641 F.2d 746, 753–54 (9th Cir. 1981) (emphasis added). We can hardly say that Purvis, a small-time farmer, operates a large corporate enterprise.[2] To do so yields harsh results, as is evident by the majority's decision, and unduly restricts the doctrine of strict products liability beyond that intended by the "commercial setting" exception.

Finally, the majority suggests that the defendant should not be held liable on strict liability grounds because the "Conto" barn was not unreasonably dangerous to plaintiff's property. However, this was a question of fact which was properly submitted to the jury. Since the jury's determination was not clearly erroneous, I would affirm the district court's judgment, holding the defendant liable to Purvis under South Carolina's strict products liability statute.

---

1. E.g., *Tokio Marine & Fire Ins. Co. v. McDonnell Douglas Corp.*, 617 F.2d 936 (2nd Cir. 1980); *Scandanavian Airlines System v. United Aircraft Corp.*, 601 F.2d 425 (9th Cir. 1979); and *Ebasco Services, Inc. v. Pennsylvania Power & Light Co.*, 460 F.Supp. 163 (E.D.Pa.1978).

2. Of course, we would face a more difficult question if the plaintiff was a large corporate farmer with thousands of acres of land, but that is not the case here.