**KAISER ALUMINUM AND CHEMICAL CORPORATION, A Delaware Corporation, Plaintiff–Appellant,**

**v.**

**WESTINGHOUSE ELECTRIC CORPORATION, A Pennsylvania Corporation, Defendant–Appellee.**

**No. 90–2189.**

United States Court of Appeals, Fourth Circuit.

Argued March 4, 1991.

Decided Dec. 2, 1992.

As Amended Jan. 8, 1993.

Richard Lawrence Gill, Robins, Kaplan, Miller & Ciresi, Minneapolis, Minn., argued (William M. Lutz, Robins, Kaplan, Miller & Ciresi, Thomas V. Flaherty, Kay, Casto, Chaney, Love & Wise, Charleston, W. Va., on the brief), for plaintiff-appellant.

Shawn Patrick George, Jackson & Kelly, Charleston, W. Va., argued (Anthony J. Majestro, Robert L. Elkins, Jackson & Kelly, Charleston, W. Va., on the brief), for defendant-appellee.

Before RUSSELL, Circuit Judge, and HILL, Senior Circuit Judge of the United States Court of Appeals for the Eleventh Circuit, sitting by designation, and WARD, Senior United States District Judge for the Middle District of North Carolina, sitting by designation.

## OPINION

DONALD RUSSELL, Circuit Judge:

This is a suit between a customer (Kaiser) who had purchased from a manufacturer (Westinghouse) a component of its electric generator which supplied power for the operation of its aluminum fabricating plant at Ravenswood, West Virginia. The manufactured article was to be used as a spare, available in event of any problem affecting the currently operating generator. When first put into service, the component showed evidences of slippage in the shaft on the second day of operation. The component was returned to Westinghouse for correction of the malfunction. The manufacturer returned the component a few weeks later after repairing the problem. Six or seven years later, the component was placed again in service but experienced electrical failures. As a result of such failures, the customer sustained (1) damages to the component itself and (2) a loss of profits by reason of the plant shutdown of approximately ten days, forced by the "electric failure." The customer sued to recover such losses, contending its suit was one in negligence arising out of the repair of the component. The manufacturer took the position that the action was in effect one in products liability where the redress is by strict-liability-in-tort action, a form of action uniquely developed for the manufacturer-vendor and customer-vendor situation. The district court implicitly found the suit to be in products liability, governed by the rules in the strict-liability-in-tort action, and we agree. Treated as

such an action, the district court granted the motion of the manufacturer to dismiss the action under Rule 12(b)(6). It found that the recovery of "lost profits" in a strict-liability-in-tort action is impermissible; "lost profits" are only recoverable in an action in contract under the controlling law of West Virginia. Its second claim for damages to the component itself is recoverable only if such damages are the result of a "sudden, calamitous event" caused by a defective product. There is no proof of such "sudden calamitous event" to which the damages were attributable. We accordingly affirm the dismissal action.

## I.

The plaintiff, Kaiser Aluminum and Chemical Corp. (Kaiser), operates an aluminum fabricating plant at Ravenswood, West Virginia. The plant's operation is powered by an electric "motor generator" set. Essential components of such generator are a "motor-generator stator" and a "motor-generator rotor-shaft" (hereinafter referred to collectively as "rotor"). In order to avoid a plant shut-down in the case of a breakdown of the presently operating rotor, Kaiser determined to acquire a spare rotor. Such spare component was purchased in 1976 by Kaiser from the defendant, Westinghouse Electric Corp. (Westinghouse). It was not a readily available "shelf item," but was an item to be manufactured per specifications. The manufacture of the rotor was completed and the rotor delivered to Kaiser at its plant in Ravenswood in February, 1979. Kaiser did not immediately put the rotor in service; instead, it placed the rotor in storage until April 26, 1981, when such component was substituted for the original rotor "after a breakdown of the existing stator and rotor/shaft that had been in place." The next day, Kaiser alleged that the rotor "malfunctioned, in that the rotor was observed to have slipped horizontally on the shaft," and that such slipping had "caused damage to the rotor because the rotor came into contact with metal casing sur-

rounding the rotor on the north side." Kaiser referred in its statement of facts in its complaint to no other problem during the use of the spare component on April 26 and April 27, 1981. Kaiser immediately complained to Westinghouse as the manufacturer from whom it had purchased the rotor. After receiving back the rotor, Westinghouse proceeded to make some corrections and adjustments to the rotor, and returned it to Kaiser in early May, 1981. Kaiser again put the rotor in storage until the existing motor generator ". . . suffered a breakdown in December 1989," [1] when Kaiser substituted the spare rotor for the previously operated rotor.

The complaint states that when Kaiser proceeded on December 3, 1989, "to energize and start" the generator with its "spare rotor shaft component," "electrical failures occurred immediately in the spare rotor-shaft component," resulting in "physical damage to the motor-generator set, and rendering [the mill] . . . inoperable for approximately 10 days." Kaiser alleged that such "electrical failure" was proximately due to the negligence of Westinghouse in "failing to properly and fully investigate the circumstances of the malfunctioning [in April, 1981]," in failing to "properly and fully examine and test the spare rotor/shaft assembly to determine the full nature and extent of the function" and to "fully and properly examine and test the spare rotor/shaft component after completing its repairs." Kaiser sought damages in the district court in the amount of $1,000,-000. These damages encompassed two items—one, costs of repairing the rotor, and, two, lost profits due to a ten-day shutdown of the plant.

To Kaiser's suit Westinghouse filed an answer denying the principal allegations of negligence on its part. In particular, it denied that the stator or rotor/shaft caused the problems or was responsible for the "malfunctioning" alleged to have occurred on April 27, 1981. It stated in its answer, also, a number of affirmative defenses including an allegation that the action for

1. The factual statements in quotations are taken from the complaint, which the district judge accepted as true for purposes of deciding the motion to dismiss.

lost profits was controlled by "the provisions of the Uniform Commercial Code, as enacted in the Code of West Virginia in Chapter 42–2–101 *et seq.*," and, as such, was "barred by the applicable statute of limitation." Almost simultaneously, Westinghouse filed, under Rule 12(b)(6), Fed. R.Civ.Proc., its motion to dismiss the complaint "for failure to state a claim on which relief [could] be granted." The motion to dismiss was extensively briefed by the parties. The motion itself was heard by the district judge on the facts set forth in the complaint, which, for purposes of the motion, the court accepted as true, and on the arguments, oral and in the briefs of the parties. The district judge granted the motion to dismiss, recording his reasoning for such dismissal in his Opinion and Judgment. *Kaiser Aluminum & Chem. Corp. v. Westinghouse Elec. Corp.*, No. 88–1512, 1989 WL 386959 (S.D.W.Va. Oct. 12, 1989).

II.

In his opinion granting the motion, the district judge seems to have assumed that the action was one in strict liability in tort as established under the law of West Virginia, which, under *Erie R. Co. v. Tompkins*, 304 U.S. 64, 77–78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938), and *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941), is controlling here. Earlier, in *Morningstar v. Black & Decker Mfg. Co.*, 162 W.Va. 857, 253 S.E.2d 666, 676 (1979), West Virginia had adopted as a part of its common law the doctrine of strict liability in tort substantially as stated in Section 402A of *Restatement (Second) Torts*. Based on this adoption, the district judge began his decision on the issues in the case with the declaration that, first, Kaiser's claim for lost profits represented damages for "economic losses" and, as such, were "not recoverable in such an action." *See Star Furniture Co. v. Pulaski Furniture Co.*, 171 W.Va. 79, 297 S.E.2d 854, 859–60

(1982).[2] The district judge added, secondly, that "the damage *to the product* [which was Kaiser's second claim] must result from a sudden calamitous event attributable to the dangerous defect or design of the product itself." *See Capitol Fuels, Inc. v. Clark Equip. Co.*, 181 W.Va. 258, 382 S.E.2d 311, 313 (1989) (emphasis added). In that connection, he assumed that there were two facts to be established in proving a strict liability action for damage to the product itself: (1) the product must have had a " 'dangerous defect,' " and (2) the injury for which recovery was sought had to result from "a sudden calamitous event attributable to the 'dangerous defect.' " The district judge sought to apply those standards to the allegations of Kaiser's complaint in connection with its claim for damages to the product itself. He found that "Kaiser did not allege that the electrical failure [in 1987, which is the occasion for its claim] was attributable to any inherently dangerous defect or design of the rotor/shaft component," nor was the failure "the result of a sudden calamitous event." The absence of any such allegations, he concluded, required the dismissal of the claim. He accordingly entered an order of dismissal under Westinghouse's Rule 12(b)(6) motion to dismiss.

III.

After the filing of the district judge's order dismissing the complaint with judgment in favor of Westinghouse, Kaiser filed a motion to vacate the order of judgment under Fed.R.Civ.Proc. 52(a) and 59(e). Along with its memorandum in support of its motion to vacate, Kaiser attached excerpts from certain discovery depositions taken at its instance largely in the period between the filing of the Rule 12 motion and the decision of such motion. The inclusion of these excerpts apparently was for the primary purpose of answering the grounds on which the district judge relied in his order of dismissal of the strict-liabili-

---

**2.** "Economic loss[es]" are "damages for inadequate value, costs of repair and replacement of the defective product or consequent loss of profits without any claim of personal injury or damage to other property.... The line of demarcation between physical harm and economic loss

... reflects the line of demarcation between tort theory and contract theory." *Jones & . Laughlin Steel Corp. v. Johns–Manville Sales Corp.*, 626 F.2d 280, 284–85 (3d Cir.1980) (citation omitted).

ty-in-tort action. Their very inclusion is in a way a concession by Kaiser that its suit was in strict liability in tort. Thus, three of the depositions were from expert witnesses who sought to establish that, in their opinion, the rotor had "a dangerous defect." They identified the defect as the result of "a phase-to-phase fault in a part of the rotor windings or coils," which, uncorrected, caused the "failure" in 1979. The deposition of Duane Alderman, who, along with his brother, on the other hand, were the only witnesses to the accident in 1979, was manifestly intended to establish that the "failure" resulted from "a sudden calamitous event." All these circumstances had relevancy almost entirely to a products liability claim; indeed, this very expression includes unique strict liability terms.

■ These depositions, it must be emphasized, had been taken before the district judge filed his decision, but had not been presented to or made available to the district judge at or before the hearing, though Kaiser had access to the depositions for some time before the decision. It is well established that affidavits and exhibits not before the court in making its decision are not to be considered on appeal. *Gilson v. Republic of Ireland*, 787 F.2d 655, 659 (D.C.Cir.1986); *United States v. Drefke*, 707 F.2d 978, 983 (8th Cir.), *cert. denied*, 464 U.S. 942, 104 S.Ct. 359, 78 L.Ed.2d 321 (1983); *Munoz v. International Alliance of Theatrical Stage Employees and Moving Picture Machine Operators*, 563 F.2d 205, 209 (5th Cir.1977). It should be emphasized that all that the district judge had before him at the time as a summary of the facts on which to base his decision were included in the complaint. And the district judge made this plain at the outset of his opinion.

■ The district judge denied the motion to vacate. Though he filed a formal opinion of denial, such opinion included no explanation of the reasons for his denial. Counsel for Westinghouse suggests that the district judge may have dismissed the motion because of Kaiser's failure to present to the district court earlier the evidence

which it had had access to for some time before the decision. Perhaps a stronger reason, again not expressly stated by the district judge, was the effect that accepting this "new" evidence would have had on the proceedings. Had the evidence been accepted by the district judge, it would have immediately converted the proceedings from one under Rule 12 to one under Rule 56, Fed.R.Civ.Proc., and would have required reopening the entire proceedings, and all because of the inaction of Kaiser. Rule 12(c) provides that "[i]f, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion [should] be treated as one for summary judgment and disposed of as provided in Rule 56." Despite these difficulties, we might be hesitant to sustain a denial of a motion to vacate without any expressed reasoning for the court's decision, if the additional evidence, though filed untimely, indicated that the decision under review, if upheld, would result in a miscarriage of justice. But, this is not a case warranting such leniency. As we later point out, the additional evidence, in our judgment, would not warrant a result different than that represented in the district court's original decision. We, therefore, do not disturb the district judge's dismissal of the motion to vacate, and turn to another issue prior to examining the merits of the case itself.

## IV.

The initial target of Kaiser's appeal, as stated in its brief and pressed in oral argument, is that the district court mistook the nature of its claim. Kaiser asserts, both in its brief and in its oral argument in this court, that its action is not "a products liability claim based on the manufacture and sale of a defective product." It characterizes its suit as one "based solely on the theory of negligent repair—that is, the conduct of Westinghouse in repairing the spare rotor component." It instances its studied failure in its complaint to use the strict liability terms of art—"design defect" and "inherently dangerous"—as support for this conclusion. Finally, it cites

*Skeen v. C & G Corp.*, 155 W.Va. 547, 185 S.E.2d 493 (1971), and *Elsey Ford Sales, Inc. v. Solomon*, 167 W.Va. 891, 280 S.E.2d 718 (1981), as clear precedents for its position that its complaint very plainly stated a suit for negligent repairs and for nothing else.

Westinghouse, on the other hand, takes the position that this action was by its very nature a products liability action. It declares that this was the position of Kaiser in the district court. It points to the language in the district court's order of dismissal to the effect that Kaiser in the hearings in the district court "recognized[ed] that it [could] recover only under the principles set forth in *Star Furniture* [*Star Furniture Co. v. Pulaski Furniture Co.*, 171 W.Va. 79, 297 S.E.2d 854 (1982)]." *Star Furniture*, it observed, was a case which dealt exclusively with "the doctrine of strict liability [in tort]." *Star Furniture*, 297 S.E.2d at 856. Westinghouse also emphasizes that the "new" evidence which Kaiser sought to present, through its motion to vacate, was wholly directed at establishing a cause of action under the principles stated in *Star Furniture.* In this additional testimony, for instance, were three depositions from what were apparently expert witnesses. All their testimony was directed at establishing that the rotor was "defective" when Kaiser first sought to use it in 1981. The "defect" was identified by the experts to have been a "phase-to-phase" fault "on the rotor windings." It was a defect, in the opinion of these experts, which was easily discoverable and correctable by a "surge test." It is this alleged failure to have used the surge test which is the basis for its claim of negligent repair, since the experts conceded that all mechanical steps taken in repairing the rotor were proper. In short, the real problem was one that existed when the rotor was first delivered to Kaiser, according to these experts. None of the 1981 repairs in those circumstances could have caused the accident. This was not a case to recover independently for negligent repair but one to recover in strict liability.

## V.

■ Such were the conflicting positions of the parties on the nature of the action herein. The district judge did not, in his opinion, expressly determine that the action was in products liability. This, however, is implicit in his decision. He found the case controlled by *Star Furniture, supra,* a decision which was equivalent to a finding that the action was in strict liability in tort, and this conclusion seems correct. The doctrine of strict liability in tort was formulated specifically for litigation between manufacturer and customers arising out of a sale of products. *See* 63 Am.Jur.2d *Products Liability* § 529, at 727. It "applies to both the manufacturer and the seller, who are engaged in the business of selling such product which is expected to and does reach the user without substantial change in the condition in which it was sold." *Morningstar*, 253 S.E.2d at 683 n. 22. The essence of such suits was well stated by Justice Blackmun in *East River S.S. Corp. v. Transamerica Delaval Inc.*, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986):

> The paradigmatic products-liability action is one where a product "reasonably certain to place life and limb in peril," distributed without reinspection, causes bodily injury. The manufacturer is liable whether or not it is negligent because "public policy demands that responsibility be fixed wherever it will most effectively reduce the hazards to life and health inherent in defective products that reach the market."

*Id.* at 866, 106 S.Ct. at 2300 (citation omitted).

The benefits of the doctrine to the plaintiff in a case such as this are, as *Morningstar*, 253 S.E.2d at 677, said, "that it relieves [the plaintiff] of proving specific acts of negligence and protects him from the defenses of notice of breach, disclaimer, and lack of privity in the implied warranty concepts of sales and contracts," that, in effect, the doctrine of strict liability "relieve[s] the plaintiff from proving that the manufacturer was negligent in some particular fashion during the manufacturing pro-

cess and to permit proof of the defective condition of the product as the principal basis of liability." This case fits that description.

■ The suit here arises from a sale to a customer-purchaser by a manufacturer of an article to be manufactured pursuant to certain requirements. Such a product not infrequently has breakdowns in the early period of use. The manufacturer in such a case must make repairs or corrections in the product in conformity with its implied warranty of merchantability and of good workmanship. These repairs or corrections are not separate from the sale of the article; they are merely steps taken to conform the product to the expected performance requirements of the product purchased. As such, they are an integral part of the manufacturer's bargained-for performance of supplying a sound product per the purchase agreement. And this is why Westinghouse made no charge and filed no bill for the repairs and corrections made in 1981 and why Kaiser paid nothing for such repairs. Moreover, Kaiser's cause of action depends ultimately on establishing that the product, either from date of delivery or from the date of the correction in 1981, was a "defective product" to which was to be attributed the "event" in 1988. Thus, Kaiser's case is one which presents all the necessary elements of a products liability case.

We find further that the very precedents cited by Kaiser do not support its contrary view—in fact, they, if anything, lend support to Westinghouse's contention. *Skeen,* for instance, was a case by a purchaser of a mobile home seeking damages from the dealer from whom it had purchased the home and from the manufacturer of the home. The suit against the manufacturer, which is the one in the case analogous to the case here, was one for *breach of warranty* (a contract cause of action), not negligent repair. The manufacturer's defense to the warranty claim was a disclaimer clause in the contract between the manufacturer and dealer. However, the manufacturer had not pled the disclaimer, and the court held that, in the absence of an affirmative plea of the disclaimer, the manufacturer was barred from relying on the disclaimer. The judgment against the manufacturer was thus *in contract* under the warranty; it was not based on any theory of products liability or negligent repair. Moreover, the Supreme Court of West Virginia had not incorporated into the common law of West Virginia the doctrine of strict liability in tort in suits against manufacturers at the time this action arose and was decided.[3] *Elsey Ford, supra,* is equally inapplicable. In that case, Elsey Ford sued Solomon, the defendant, for the balance due on the purchase of a truck. Solomon responded with a counterclaim pleading breach of warranty arising out of a defect in the truck. In such an action, "lost profits" can be recovered. *See East River S.S. Corp. v. Transamerica Delaval,* Inc., 476 U.S. 858, 873, 106 S.Ct. 2295, 2303, 90 L.Ed.2d 865 (1986); *Basham v. General Shale,* 180 W.Va. 526, 377 S.E.2d 830, 833 (1988). Had it sought to sue under strict liability in tort, it could not have recovered lost profits. *See Star Furniture,* 297 S.E.2d at 859–60 ("The proper relationship between tort law and the Uniform Commercial Code requires that lost profits be pursued under a warranty or contract theory cause of action rather than strict liability"). It is true that Solomon had two other counterclaims which were unquestionably suits for negligent repair under independent contracts of repair; in neither of these cases was there a purchase and sale, and thus no action in strict liability was available. It is evident from this review of its supporting authorities that such authorities lend no support to Kaiser's theory of its action; in fact, they support the conclusion that Kaiser should have sought relief in contract under a breach of warranty claim if it wished to recover lost profits, which was its primary claim herein. We now turn to the law controlling in this appeal.

**3.** *Skeen* was decided in 1971; *Morningstar,* which is the authority by which the doctrine of strict liability in tort was incorporated into the common law of West Virginia, was decided eight years later in 1979.

### VI.

We begin a review of the law applicable in this case, as did a recent scholarly Note, by observing that traditionally, "both contract [warranty] and tort [negligence] provide[d] the consumer [such as the plaintiff herein] with a remedy to recover damages caused by a defective product." Elizabeth A. Heiner, Note, *Sunnyslope Grading, Inc. v. Miller, Bradberg & Risberg, Inc.: What Recovery for Economic Loss—Tort or Contract,* 1990 Wis.L.Rev. 1337 (1991). While the two doctrines had similarities and originally were constrained by like concepts of privity, they clearly differed in their purposes and often in their results. As the Note just cited observes:

> While contract remedies protect the parties' expectations, tort remedies impose a duty on the manufacturer to market goods that are safe and suitable for their intended use. Contract remedies protect society's interests in the performance of promises. By contrast, negligence and strict liability claims protect society's interest in freedom from harm.

*Id.* at 1340–41. As we have said, whether suing a manufacturer in tort or contract, plaintiffs had long been hobbled in their right of recovery by a narrow rule of privity. But, particularly after the 1960s, such a rule came under the sharp criticism that "[t]he obligation of the manufacturer should not be based alone on privity of contract. It should rest, as was once said, upon 'the demands of social justice.'" *Henningsen v. Bloomfield Motors, Inc.,* 32 N.J. 358, 161 A.2d 69, 83 (1960), *quoting Mazetti v. Armour & Co.,* 75 Wash. 622, 135 P. 633, 635 (1913). This feeling was generated by a growing recognition of the rapid changes in marketing practices. Privity, it was said, had been acceptable "when marketing conditions were simple, when maker and buyer frequently met face to face on an equal bargaining plane and when many of the products were relatively uncomplicated and conducive to inspection by a buyer competent to evaluate their quality" but "[w]ith the advent of mass marketing, the manufacturer became re-

mote from the purchaser, sales were accomplished through intermediaries, and the demand for the product was created by advertising media. In such a recovery, it became obvious that the consumer was the person being cultivated," and that the old standards of privity were no longer acceptable. *Id.* 161 A.2d at 80–81 (quotations omitted). As Justice Blackmun well put it, "Products liability grew out of a public policy judgment that people need more protection from dangerous products than is afforded by the law of warranty." *East River,* 476 U.S. at 866, 106 S.Ct. at 2299.

The promulgation in *Greenman v. Yuba Power Products, Inc.,* 59 Cal.2d 57, 27 Cal. Rptr. 697, 377 P.2d 897 (1963), of the modern doctrine of strict liability in tort, which freed the plaintiff of the restraints of privity, disclaimer, etc., resulted.

Judge Traynor in *Greenman* formulated this doctrine of strict liability in tort thus:

> A manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being.

*Id.* 27 Cal.Rptr. at 700, 377 P.2d at 900.

In concluding this part of his opinion, Judge Traynor said:

> To establish the manufacturer's liability it was sufficient that plaintiff proved that he was injured while using the [product] in a way it was intended to be used as a result of a defect in design and manufacture of which plaintiff was not aware that made the [product] unsafe for its intended use.

*Id.* 27 Cal.Rptr. at 701, 377 P.2d at 901.

Two years after *Greenman,* the American Law Institute incorporated the strict liability doctrine in its Section 402A of the *Restatement (Second) Torts,* declaring:

> One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer or to his property....[4]

---

**4.** As this language indicates, the doctrine, as

initially promulgated, was limited to "injury to a

By 1982, some forty states had announced their adoption of the doctrine by judicial decision, four had done so by legislation, and six either had not acted or had refused to adopt. William R. Clement, Jr., Note, *Strict Liability and Warranty in Consumer Protection*, 29 Washington & Lee L.Rev. 1347, 1352 (1982). The United States Supreme Court, acting in its admiralty jurisdiction, adopted the doctrine. *See East River*, 476 U.S. at 865, 106 S.Ct. at 2299. The West Virginia Supreme Court also adopted the doctrine, by judicial decision, in *Morningstar*, 253 S.E.2d at 680. In adopting the doctrine, however, the Court was anxious to underscore that strict liability was not absolute liability and that so to characterize it would be a "misnomer." *Id.* at 677, *quoting Dippel v. Sciano*, 37 Wis.2d 443, 155 N.W.2d 55, 63 (1967). The essential purpose of the doctrine was not to provide absolute liability but to relieve the plaintiff in the products liability suit "of proving specific acts of negligence and [to] protect[ ] him from the defense of notice of breach, disclaimer, and lack of privity in the implied warranty concepts of sales and contracts" and to make "proof of the defective condition of the product ... the principal basis of liability." *Id.* In effect, "defect is the conceptual linchpin that holds products law together; a system of liability without defect is beyond the capacity of courts to implement." Henderson and Twerski, *Closing the American Products Liability Frontier: The Rejection of Liability without Defect*, 66 New York L.Rev. 1263, 1267 (1991). However, as the statements of the doctrine as given above indicate, there is "a notable lack of uniformity" in arriving at a precise definition of the "linchpin" term, "defective." *Morningstar*, 253 S.E.2d at 680. This was pointed out by the Court in *Morningstar*, when, after reviewing some of the definitions of a "defective" condition under the doctrine, the Court determined that, so far as it was concerned, the appropriate test for defectiveness was "whether the involved product is defective in the sense

that it is not reasonably safe for its intended use." *Id.* at 683. Other authorities have given different statements of the definition. Section 402A, *Restatement (Second) Torts*, defines the defect as one which is "unreasonably dangerous." *East River*, 476 U.S. at 866, 106 S.Ct. at 2299, requires that the defect be one "reasonably certain to place life and limb in peril." *Capitol Fuels*, 382 S.E.2d at 313, refers to the necessity of a "dangerous defect or design," language which it took from *Star Furniture*, 297 S.E.2d at 858–59. Perhaps the most precise definition, though somewhat awkwardly appearing, is "unreasonably unsafe," which was used by this Court in *Purvis v. Consolidated Energy Products Co.*, 674 F.2d 217, 222 (4th Cir.1982). What is common to all these definitions is the idea that "defect" in the strict liability context is not synonymous with ineffectiveness or "ordinary" malfunction; the "defect" must be one that is unreasonably unsafe for the intended use of the product. It is the safety and dangerousness of the defect that is the essential element of the doctrine.

While the principles discussed are generally accepted by all the courts which have adopted the strict liability in tort doctrine, there is one issue on which there is a sharp conflict among the authorities. This conflict relates to recovery for damages caused to the product itself. The conflicting views on this difference were carefully reviewed by Justice Blackmun in *East River*, 476 U.S. at 868–75, 106 S.Ct. at 2301–04. The Court in that case, making a distinction between "tort recovery for physical injuries and warranty [or contract] recovery for economic loss," saw such distinction to be "not arbitrary" but fully in accord with the differing purposes of tort and contract recoveries in products liability cases. *Id.* at 871, 106 S.Ct. at 2302. As the Court said,

> the tort concern with safety is reduced when an injury is only to the product itself.... In contrast, when a product

human being"; the doctrine was quickly extended to damage to any property of the plaintiff *other* than damage to the product itself. *East*

*River*, 476 U.S. at 866–67, 106 S.Ct. at 2299–2300.

injures itself, the commercial user stands to lose the value of the product, risks the displeasure of its customers who find that the product does not meet their needs, or, as in his case, experience increased costs in performing a service.... Damage to a product itself is most naturally understood as a warranty[5]

*Id.* at 871–72, 106 S.Ct. at 2302.

The West Virginia Supreme Court in *Star Furniture*, however, had decided prior to *East River* to take what it regarded as an intermediate position in the recoverability of damages to the product itself. It recognized the distinction between the contract suit in warranty and the strict liability in tort action. *Star Furniture*, 297 S.E.2d at 858–60. In keeping with that distinction, it held that a strict liability action may be utilized "to recover for damage to property other than the defective product" but when loss suffered is an economic loss, the injured party must pursue the remedies provided by the Uniform Commercial Code, subject to the statute of limitations contained therein. *Id.* at 857–60. In short, "[t]he proper relationship between tort law and the Uniform Commercial Code requires that lost profits be pursued under a warranty or contract theory cause of action rather than strict liability." *Id.* at 859–60.[6] Thus, so far as injury to the product itself, the West Virginia rule is that only "property damage to defective products which results from a sudden calamitous event is recoverable under a strict liability cause of action." *Id.* at 859. In adopting this rule, the Court found that it was achieving a proper adjustment of "the tension between the tort doctrine of strict liability and con-

tract theory embodied in the Uniform Commercial Code." *Id.* at 858.

■ Of course, the *Star Furniture* rule with reference to damage to the product itself is different from that adopted later by the United States Supreme Court in *East River*, where the damage was the result of a "sudden calamitous event." In fact, the Court in *East River* discussed and rejected as illogical the distinction made by *Star Furniture* on the right of recovery for damage to the product when the damage results from an "abrupt, accident-like event." *East River*, 476 U.S. at 870, 106 S.Ct. at 2302. Practically all the cases decided subsequently to *East River* have followed *East River* on this holding; in fact, some courts which had reached a result similar to that of *Star Furniture* on this issue later, after *East River*, reversed their position to conform with that of *East River*. Compare, *Aloe Coal Co. v. Clark Equipment Co.*, 816 F.2d 110, 116–17 (3d Cir.1987), *cert. denied*, 484 U.S. 853, 108 S.Ct. 156, 98 L.Ed.2d 111 (1987), and *Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.*, 652 F.2d 1165, 1172 (3d Cir. 1981). The West Virginia court, however, decided subsequent to *East River* not to abandon the rule stated by it in *Star Furniture* because of the decision in *East River* and, despite *East River*, to reaffirm its ruling in *Star Furniture*. *Capitol Fuels*, 382 S.E.2d at 313. Accordingly, under West Virginia law, damage to the product itself can be recovered in a strict liability suit but *only* if the damage was the result of a "sudden calamitous event."

■ We distill from this review of the pertinent decisions of the West Virginia

---

**5.** Kaiser has apparently not filed a warranty action. It is suggested by Westinghouse that this failure is because the statutes of limitation (repose) applicable in such cases has long since run. *See Taylor v. Ford Motor Co.*, 185 W.Va. 518, 408 S.E.2d 270, 273 (1991).

**6.** This is not a rule unique to West Virginia; it is the general rule adopted in practically all jurisdictions. As the Court said in *Jones & Laughlin Steel Corp.*, 626 F.2d at 286, "even in actions for negligence, a manufacturer's liability is limited to damages for physical injuries and there is no recovery for economic loss alone."

This same thought was declared in Mark A. Kaprelian, Note, *Privity Revisited: Tort Liability by a Commercial Buyer for a Defective Product's Self–Interested Damage*, 84 Mich.L.Rev. 517, 520 (1985):

It is generally accepted that economic losses, at least when unaccompanied by any physical damage, are not recoverable in an action based on strict tort liability. The rationale for this rule is that the buyer's economic interests are adequately protected by the Code, and subjecting a seller to strict liability for exclusively economic losses would displace the legislatively enacted Code framework.

courts two principles which are dispositive of the issues in this case if one assumes, as we do, that the action herein is basically a strict liability in tort action:

(1) Lost profits connected with the sale of a product are not recoverable under the West Virginia doctrine of strict liability in tort; such damages are recoverable only in contract under the Uniform Commercial Code;

(2) Damages for injury to the defective product itself in a product liability suit are recoverable only if such damages are the result of a "sudden calamitous event."

We proceed to apply these principles to the facts of this case.

### VII.

■ Kaiser seeks recovery in this action for two specific items of damages. The first is a claim for lost profits arising out of the forced discontinuance of operations of its plant by reason of the injury on December 3, 1987 to its generator operation; and the second is for damage to the generator by the failure of the generator on the same date. The first claim is clearly without merit in this strict tort liability suit because, as we have seen, lost profits are not recoverable in a strict-liability-in-tort action under the West Virginia doctrine of strict liability in tort. It follows ineluctably that Kaiser's claim for lost profits in this case was properly dismissed by the district judge—and this result is equally true whether considered solely under the allegations of the complaint or under the expanded record which Kaiser seeks to establish in its presentation of new evidence in support of its motion under Rule 59 to vacate the judgment herein.

■ The claim for damages to the defective product, though not necessarily as clearly impermissible as the claim for lost

profits, is actually no more tenable. Certainly, the district judge, who had only the facts as set forth in the complaint and decided the case on that basis, correctly dismissed the claim because the plaintiff made no charge that the rotor was either "dangerously defective" or that the damage to the product was the result of a "sudden, calamitous event."[7] Under those circumstances, damages for injury to the product itself were not recoverable in strict liability. Both a finding of a "defective product" and a finding that the damage was the result of a "sudden calamitous event" are the two essential elements of a strict liability action for recovery of damages to the product itself. We, therefore, affirm the decision of the district judge in dismissing part of Kaiser's action. Kaiser, however, has sought by its motion to vacate the judgment under Rule 59, and has supplied additional evidence that relates to this claim. While not obligated to, we proceed to consider this additional evidence in connection with the relevant standards for a strict liability action.

Kaiser has submitted evidence from expert witnesses relating to the existence of a defect in the rotor, which these experts allege caused the accident on December 8, 1989. These witnesses testified that there was a "phase-to-phase fault ... in the rotor windings," creating "a cavity in the windings" or coils of the rotor. It was the theory of such witnesses that this defect would have been revealed by a "surge test" which they thought should have been performed when Kaiser returned the rotor to Westinghouse after the slippage of the rotor on the shaft on the second day of the spare rotor's operations in April, 1981. According to those witnesses, the "cavity" in the rotor's windings would have been corrected had Westinghouse utilized a surge test, discovered the problem, and corrected it. The difficulty with this theory is that the problem with the rotor in April, 1981,

---

7. Kaiser recognized that the allegations of the complaint omitted any statement that the damage to the product was attributable to a sudden calamitous event. Since the court was deciding the case on the basis of the allegations in the complaint itself, this omission admittedly would be fatal to any right of Kaiser to recover under the theory of strict liability. It therefore asked in its brief and in oral argument that we at the appellate level order an amendment to the complaint by adding the words that the damage to the product was attributable to a sudden calamitous emergency. Manifestly, we do not have the power to authorize such amendments at the appellate level.

was not in the safe operation of the rotor; the rotor apparently worked satisfactorily and safely on the approximately two days the rotor was operated in 1981. The only problem experienced in the operation of the rotor in 1981 was that the rotor slipped and was hitting against other parts of the generator. Under such a circumstance, nothing indicated a need for a surge test or suggested that there might be a "cavity" in the rotor's coils.

Moreover, there is a question whether the "cavity" (if it existed) rendered the rotor a "dangerous" product, not "reasonably safe." The rotor had a "circuit breaker" which operated to cut the generator off immediately if any problem arose in the operation of the rotor. That "circuit breaker" worked perfectly on December 3 when the "event" occurred. The whole event consumed about "two seconds," according to the only eyewitness of the event. A small, harmless amount of electricity escaped during that period, but the two witnesses (only one testified) evidenced no fright, experienced no shock, and suffered no injury. Neither was there any damage to any property other than to the product itself.

More importantly, it certainly cannot be argued that what occurred to the rotor on December 3, 1987 was a "sudden, calamitous event," and that is an essential element for a permissible claim for injuries to the product itself in a strict liability lawsuit. "Calamitous" is a strong term;[8] it unquestionably does not apply, it would seem, to an event that, when experienced by the only persons present, caused those present to assume they were under no threat of any harm. Copeland testified that he and his brother actually "didn't feel that the rotor had sustained any damage," much less felt themselves in any peril. He explained his reaction to the event: "We were confident that one of our stress cones had failed and that's the first place we went to look. Duane [his brother] and I immediately went down to the basement with a flashlight and looked at our stress cones." He explained his reason for assuming that one of the stress cones had failed was that "it would sound the same way and act the same way as the rotor had on this occasion in December, 1987."

It is obvious from this statement that shutoffs for failure of a cone stress were not something the witness had not experienced frequently before and that such event did not frighten him. Otherwise, he would not have recognized the "sound" and the action. Moreover, as we have already observed, no one experienced the slightest physical or psychological injury as a result of this event. It is true that there was some minimal "eking" or "tracing," indicating electric voltage being discharged. As we said, the evidence indicated it was minimal. It left no marking on the floor or walls of the building; it left no physical signs on the person of those present. The entire sequence of events on December 3, "from the time when the switch was flipped [to start the motor,] the motor starts, the hum begins [of the coils saturating], [and the time] as the starter kicks off the motor, was no more than four to five seconds." At another point, the witness fixed the time that the coils began to saturate and the circuit breaker kicked the motor off as "a couple of seconds." We would conclude that as a matter of law there was no "calamitous event" on this occasion of sufficient magnitude to permit a finding that the damage to the product here was the result of a "calamity." Under such a conclusion, the damage to the product would not be recoverable in strict liability.

It follows that, even were we to consider the added evidence included in Kaiser's addendum to its motion to vacate the judgment, we would still affirm the dismissal of this action by the district court.

AFFIRMED.

---

8. The new American Heritage Dictionary of the English Language (3d ed. 1992) defines "calamitous" as "disastrous" or "causing or involving calamity." It defines "calamity" as "an event that brings terrible loss, lasting distress or severe affliction" or "disaster." It is clear from this definition that an event such as occurred in this case could not qualify as "calamitous."